# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE TIBCO SOFTWARE INC. STOCKHOLDERS LITIGATION | CONSOLIDATED C.A. No. 10319-CB |

## MEMORANDUM OPINION

Date Submitted:  July 23, 2015
Date Decided:  October 20, 2015

Stuart M. Grant and Cynthia A. Calder of GRANT & EISENHOFER, P.A., Wilmington, Delaware; Mark Lebovitch, David Wales, Edward G. Timlin and John Vielandi of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Francis Bottini, Jr. of BOTTINI & BOTTINI INC., La Jolla, California; Juan E. Monteverde and James Wilson, Jr. of FARUQI & FARUQI LLP, New York, New York; *Counsel for Lead Plaintiff.*

Tamika Montgomery-Reeves and Bradley D. Sorrels of WILSON SONSINI GOODRICH & ROSATI, PC, Wilmington, Delaware; Steven M. Schatz, David J. Berger and Katherine L. Henderson of WILSON SONSINI GOODRICH & ROSATI, PC, Palo Alto, California; *Counsel for Defendants TIBCO Software Inc., Vivek Ranadivé, Nanci Caldwell, Eric Dunn, Manuel A. Fernandez, Phillip Fernandez, Peter Job, David J. West and Philip Wood.*

Gregory P. Williams, Anne C. Foster and J. Scott Pritchard of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Yosef J. Riemer, P.C., Matthew Solum,  David S. Flugman and Shireen A. Barday of KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Defendants Balboa Intermediate Holdings, Balboa Merger Sub, Inc., and Vista Equity Partners V, L.P.*

Kevin G. Abrams, J. Peter Shindel, Jr. and Matthew L. Miller of ABRAMS & BAYLISS LLP, Wilmington, Delaware; Paul Vizcarrondo, Jr., Carrie M. Reilly, Steven Winter and Luke M. Appling of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Defendant Goldman, Sachs & Co.*

**BOUCHARD, C.**

This decision is round two of an action in which a stockholder of TIBCO Software Inc. challenges the per-share consideration that a private equity fund ("Vista") agreed to pay to acquire TIBCO in a merger that closed on December 5, 2014. The merger agreement provided for stockholders to receive $24 per share. Based on the number of fully diluted shares of TIBCO outstanding, which was accurately reflected in the merger agreement, a $24 per share price implied an aggregate equity value for the transaction of approximately $4.144 billion.

Plaintiff does not challenge the sale process that led to a $24 per share merger price, which plaintiff acknowledges was a "good outcome" and which over 96% of TIBCO's stockholders voted to accept. The rub here is that Vista and TIBCO both operated under a mistaken belief that the aggregate equity value implied by the transaction was approximately $4.244 billion—approximately $100 million or $0.57 per share more than what was reflected in the merger agreement. This mistaken belief arose from a capitalization spreadsheet for TIBCO that double-counted certain shares. That spreadsheet was used by Vista during the bidding process and by TIBCO's financial advisor, Goldman, Sachs & Co., in its fairness analysis.

The share count error was discovered after the parties had signed the merger agreement on September 27, 2014. Over two weeks later, on October 16, 2014, TIBCO filed its preliminary proxy statement for the merger disclosing the share count error, which prompted plaintiff to file this action and seek to enjoin the merger. In its preliminary injunction motion, plaintiff pressed claims for reformation of the merger agreement and breach of fiduciary duty concerning the alleged failure of the TIBCO

board to take any action after the share count error was discovered to obtain the additional $100 million in equity value it thought the transaction was supposed to yield.

On November 25, 2014, I issued an opinion denying plaintiff's motion for a preliminary injunction (the "PI Opinion"). Regarding the reformation claim, I explained that plaintiff had demonstrated a reasonable probability of success of proving by clear and convincing evidence that Vista and TIBCO both operated under a mistaken assumption that the implied equity value of the merger was $4.244 billion. I further concluded, however, that plaintiff had failed to demonstrate a reasonable probability of proving by clear and convincing evidence—as required under Delaware law to reform a contract—that Vista and TIBCO had specifically agreed before signing the merger agreement that the merger would be consummated at an aggregate equity value of $4.244 billion. The record instead demonstrated that what Vista offered and what TIBCO accepted when they negotiated the final terms of the merger agreement had been expressed in terms of dollars per share (*i.e.*, $24 per share) and not in terms of an aggregate equity value.

I did not reach the merits of the fiduciary duty claim in the PI Opinion because plaintiff had failed to demonstrate the existence of irreparable harm due to the availability of a damages remedy, and because the balance of the equities clearly weighed in favor of permitting TIBCO's stockholders to decide whether or not to approve the merger and accept $24 per share for their stock of TIBCO, which they have now done.

After the merger closed, plaintiff, with the benefit of having taken some discovery, amended his complaint. The amended complaint asserts claims for reformation, breach

of fiduciary duty, aiding and abetting (against Goldman), professional malpractice (against Goldman), and unjust enrichment (against Vista and Goldman). Defendants moved to dismiss the amended complaint in its entirety for failure to state a claim for relief. For the reasons explained below, I conclude that all of the claims, except the claim for aiding and abetting claim against Goldman, fail to state a claim for relief.

The reformation claim is legally deficient for the same reason plaintiff came up short at the preliminary injunction phase of this case. Specifically, plaintiff has failed to allege facts demonstrating the existence of an antecedent agreement between Vista and TIBCO inconsistent with the price term of the merger agreement. Thus, although I am sympathetic to plaintiff's desire to recover the additional $100 million that Vista apparently was willing and intended to pay to acquire the equity of TIBCO, his claim for reformation simply does not pass muster under the strict requirements of Delaware law for modifying the unambiguous terms of a contract.

As to the fiduciary duty claim, I conclude that the complaint states at most a claim for a breach of the duty of care by TIBCO's directors for their alleged failure to adequately inform themselves in the wake of the discovery of the share count error about certain basic matters one rationally would expect a board to explore to properly assess its options. But because the directors are exculpated for breaches of the duty of care, the fiduciary duty claim will be dismissed. That claim, however, forms the predicate for an aiding and abetting claim that has been sufficiently pled against Goldman. In particular, the amended complaint alleges facts from which it is reasonably conceivable that Goldman knowingly participated in a breach of the TIBCO board's duty of care by

3

creating an informational vacuum when it failed to apprise the board of a critical piece of information: that, during the crucial period in October 2014 when the board was considering options concerning the share count error, Vista admitted to Goldman that it had, in fact, relied on the erroneous share count in making its $24 per share offer.

Plaintiff's professional malpractice claim against Goldman, which is asserted under California common law, fails to state a claim based on my review of precedents suggesting that California law would not allow investors to sue a financial advisor they are not in privity with for negligence to recover purely economic losses. Finally, the unjust enrichment claims are dismissed because the subject matter concerning each of those claims is governed by a comprehensive contract.

## I. BACKGROUND[1]

### A. The Parties

Defendant TIBCO Software Inc. ("TIBCO" or the "Company"), a Delaware corporation based in Palo Alto, California, is in the enterprise software industry. TIBCO

---

[1] Unless otherwise noted, the facts recited in this opinion are based on the allegations in the Verified Second Amended Class Action Complaint ("Complaint"), documents integral to or incorporated in it, or facts of which the Court may take judicial notice. The Complaint was filed on March 3, 2015, and incorporates much of the factual record that had been developed during expedited discovery in connection with plaintiff's motion for a preliminary injunction that was heard in November 2014. Thus, the factual background recited below largely tracks the factual recitation in the PI Opinion.

In the PI Opinion, I referred to the additional per share amount attributable to the share count error as being $0.58 per share. In this opinion, I use the figure $0.57 per share as referenced in the amended pleading. *See* Compl. ¶¶ 2, 153.

is named as a defendant solely as a necessary party for the claim to reform the Agreement and Plan of Merger dated as of September 27, 2014 (the "Merger Agreement").

Defendants Vivek Ranadivé, Nanci Caldwell, Eric C.W. Dunn, Manuel A. Fernandez, Philip M. Fernandez, Peter J. Job, David J. West, and Philip K. Wood were the eight members of the TIBCO board of directors (the "Board") during the events in question. Each was a director from at least June 2014 until the merger (hereafter, the "Merger") closed, with three directors having joined the Board in 2014. Ranadivé was the Chairman of the Board and the Company's Chief Executive Officer from the Company's founding in 1997 through the closing of the Merger. The individual director defendants are referred to collectively as the "Director Defendants."

Defendant Vista Equity Partners V, L.P. ("Vista V") is a fund affiliated with private equity firm Vista Equity Partners. It formed two entities to acquire TIBCO: (i) defendant Balboa Intermediate Holdings, LLC, a Delaware limited liability ("Balboa"); and (ii) its merger subsidiary, defendant Balboa Merger Sub, Inc., a Delaware corporation ("Merger Sub"). For simplicity, I refer to these three defendants collectively as "Vista."

Defendant Goldman, Sachs & Co. ("Goldman") is an investment bank. It had been TIBCO's financial advisor before the Board initiated the sale process. In September 2014, a special committee formed to manage the sale process hired Goldman to act as its financial advisor. For its advisory services and its fairness opinion in connection with the Merger, Goldman received $47.4 million from TIBCO.

Plaintiff Paul Hudelson was a TIBCO stockholder at all relevant times. He brings this lawsuit individually and on behalf of a class of all TIBCO stockholders, excluding

5

defendants and their affiliates, during the period from September 26, 2014 through the closing of the Merger on December 5, 2014.

## B. TIBCO Decides to Explore a Sale Transaction

During the first half of 2014, several private equity firms contacted Ranadivé, then TIBCO's Chairman and CEO, to express interest in possible transactions, including a potential acquisition of the entire Company. The Board did not immediately pursue these inquiries.

On June 3, 2014, TIBCO pre-announced its financial results for the second quarter of 2014, which were lower than Wall Street's estimates. On June 6, 2014, the Board held a special meeting to discuss the Company's financial outlook and a potential sale of the Company. Representatives of Goldman attended the meeting and gave a presentation on TIBCO's general market position and strategic alternatives.

On July, 11, 2014, the Board called a second special meeting after receiving additional market analysis from Goldman. At the July 11 meeting, the Board instructed Goldman to engage in a comprehensive review of the strategic alternatives available to the Company. On July 29, 2014, at a third special meeting, the Board formally decided to explore a possible sale of the entire Company. The Board decided to reach out to the financial sponsors that had expressed interest earlier in 2014 in acquiring the entire Company.

## C. The Board Forms a Special Committee to Manage the Sales Process

On August 16, 2014, the Board held a fourth special meeting, attended by representatives of Goldman. The Board determined to engage in further review of the

6

strategic alternatives available to the Company and to form a special committee for that review comprised of defendants Caldwell, Dunn, and West (the "Special Committee"). The Special Committee was authorized to engage advisors and charged with reviewing all strategic alternatives available to TIBCO and making a recommendation to the Board regarding a course of action. On August 18, 2014, the Special Committee held its first meeting, during which it directed Goldman to contact a list of potential acquirers limited to those who would potentially buy the entire Company.

While Goldman had been analyzing possible strategic alternatives for TIBCO from at least June 2014 and negotiating with potential acquirers starting in August 2014, the relationship was not formalized until September 1, 2014, when Goldman signed an engagement letter (the "Engagement Letter"). The Engagement Letter entitled Goldman to a $500,000 retainer, which would be the only compensation Goldman would receive if no transaction occurred, and to a transaction fee of 1% of the "aggregate consideration" paid for the Company's equity securities, assuming a transaction was done at $24.50 per share or less. Under this arrangement, almost 99% of Goldman's final transaction fee of $47.4 million became contingent on closing a transaction.

D. **Goldman Provides Information about TIBCO's Capital Structure to the Two Highest Bidders**

On September 3, 2014, the Company issued a press release announcing the formation of the Special Committee to review the strategic and financial alternatives available to TIBCO. Goldman assumed responsibility for negotiations with potential acquirers, and for managing TIBCO's electronic data room of due diligence materials and

7

responding to the bidders' diligence-related questions. Throughout late August and September, Goldman discussed an acquisition of the Company with twenty-four potential acquirers. Two serious bidders eventually emerged: Vista and Sponsor B. They were the only bidders to receive access to the data room.

On August 30, 2014, Vista submitted a non-binding indication of interest for "an all-cash transaction at $23.00 to $25.00 per share of common stock and common stock equivalents."[2] Vista's initial proposal included an express assumption about the approximate number of shares of outstanding common stock and stock-based awards to be acquired.

In late August, Vista and Sponsor B sought diligence information regarding TIBCO's share count. TIBCO and Goldman prepared a spreadsheet showing the number of fully diluted shares that would need to be acquired in a merger as of August 15, 2014 (the "First Cap Table"). The First Cap Table did not list the number of fully diluted shares—it was up to the bidders to compute that number.[3] Instead, the First Cap Table listed (i) the total number of shares of common stock outstanding and (ii) line items

_____

[2] Compl. ¶ 41.

[3] As noted in the PI Opinion, it appears that a fully diluted share count was not provided because that number is partly a function of the per-share consideration. That is, as the per-share offer price increases, the amount of proceeds to be received by the holders of in-the-money options also increases and, thus, the number of share equivalents necessary to cover the in-the-money value of the options increases as well. For this reason, when Goldman provided the First Cap Table (and the subsequent versions described later), it also provided data on the exercise prices of the outstanding options and stock-based awards. I use "fully diluted shares" to refer to the sum of the share equivalent of the outstanding options and other stock-based awards at the offered consideration (based on the weighted average exercise price) plus the outstanding shares of common stock.

detailing options and various categories of stock-based equity awards outstanding, which were totaled together separately from the common stock outstanding. One of these line items stated that there were approximately 4.3 million unvested restricted shares outstanding.

It could not be determined from the face of the First Cap Table (or from subsequent versions created by Goldman and the Company) that those 4.3 million unvested restricted shares also were included in the outstanding common stock total. Thus, these restricted shares were being double-counted—once as unvested restricted shares and again as outstanding common shares. This double-counting of unvested restricted shares is at the heart of TIBCO's and Vista's misunderstandings about the total purchase price of the Merger.

According to plaintiff, the cap tables provided to Vista led it to believe that in assessing its bid and articulating it on a per-share basis, it had to divide the total purchase price it was willing and able to pay by a greater number of shares outstanding than in fact existed. The cap tables told Vista, in essence, that it had to spread the per-share merger consideration to over four million shares that did not exist.[4]

In mid-September 2014, Vista and Sponsor B requested updated share count information from Goldman. TIBCO and Goldman prepared an updated spreadsheet reflecting the Company's share count as of September 19, 2014 (the "Second Cap Table"). The Second Cap Table contained the same share count error as the First Cap

---

[4] Compl. ¶ 44.

Table: the unvested restricted shares (now approximately 4.2 million shares) were listed as a component of the outstanding stock-based equity awards, and were included in the outstanding common stock total, without any notation of this double-counting. Goldman sent the Second Cap Table to the bidders on September 21, 2014.

On September 23, 2014, Sponsor B submitted a proposal to acquire TIBCO for $21 per share. On September 24, 2014, Vista submitted a bid to acquire TIBCO for $23 per share. On September 25, 2014, Sponsor B raised its proposal to $22.50 per share. On September 25, 2014, after Sponsor B raised its proposal, Goldman asked the bidders to submit final proposals by early afternoon on September 26, 2014.

During the morning of September 26, 2014, the Board and Special Committee held a joint meeting attended by Goldman representatives and TIBCO management. At this meeting, Goldman reviewed Vista's $23 per share and Sponsor B's $22.50 per share proposals. The Board told Goldman to maximize the consideration offered by the competing bidders, and discussed the financial model and forecasts that Goldman would use in preparing a fairness opinion.

### E. Vista Calculates its Maximum Bid

The Complaint explains that a private equity firm like Vista typically looks for a per-investment target internal rate of return ("IRR") somewhat higher than its target IRR for its overall fund. Target IRR can be expressed in terms of a targeted return on a cash-on-cash basis, or a "hurdle rate," or can be expressed as an expectation that an acquired asset can be sold for X times the purchase price within Y years. To evaluate whether it can expect to achieve a minimum hurdle rate, a private equity firm will look at the

10

target's projections and potential exit value at the end of the investment period. Running the projections and exit value through the private equity firm's financial model will determine how much it believes the target is worth. The private equity firm will then assess its ability to finance the acquisition and the expected cost of doing so. Based on these calculations, the firm determines the maximum aggregate investment it can make in the target company and still have a reasonable expectation of achieving its targeted return (*i.e.*, meeting its hurdle rate), nets out any costs or debt assumption obligations, then divides the aggregate equity value by the number of shares and share equivalents outstanding to determine the maximum per-share price it can offer. In short, as plaintiff explains, the total enterprise and equity valuation necessarily comes first, and the per-share price is calculated thereafter.[5]

During the morning of September 26, 2014, an internal committee of Vista that was responsible for approving acquisition bids (the "Vista Committee") met to discuss the maximum bid Vista could make using the methodology described above.[6] At the conclusion of the meeting, the Vista Committee approved a proposal to acquire TIBCO for up to the maximum aggregate value that would allow Vista to achieve its hurdle rate. That amount was $4.237 billion of equity value, which represented a $4.305 billion enterprise value. Based on the share count information Vista had received to date, the $4.237 billion in equity value translated into a maximum price of $24.25 per share.

---

[5] *Id.* ¶¶ 47-49, 51, 55-56.

[6] *Id.* ¶¶ 61-62.

**F.      The Discovery of the LTIP Share Count Error and the Final Bids**

On September 26, after the Vista Committee meeting but before Vista had submitted a higher bid, TIBCO discovered an error in the share count information in the Second Cap Table, but not the share count error at the heart of this case. Specifically, the Second Cap Table omitted approximately 3.7 million shares in the Company's Long Term Incentive Plan (the "LTIP"), and thus understated the common stock outstanding by approximately 3.7 million shares. To correct the LTIP share count error, TIBCO and Goldman revised the Second Cap Table to reflect the Company's share count as of September 25, 2014 (the "Final Cap Table"). The Final Cap Table properly identified the approximately 3.7 million LTIP shares as a separate line item within the outstanding stock-based awards category, but it still failed to note that the unvested restricted shares (which now totaled 4,147,144 shares) that were listed as a separate line item in that same category also were included in the total common stock outstanding. Thus, the error concerning unvested restricted shares remained unrectified.

Immediately after discovering the LTIP share count error, Goldman informed the bidders, and the submission of final bids was suspended until revised share count data could be circulated. Later in the afternoon on September 26, Goldman sent Vista summary share count data, which corrected the LTIP share count error, but which still double-counted the unvested restricted shares. Vista responded that it wanted a full, updated capitalization table "in the exact format" used for the prior cap tables. Goldman then sent the Final Cap Table to the bidders.

After receiving the Final Cap Table, Vista reran its internal leveraged buyout financial model and prepared an updated investment committee memorandum reflecting the new share count. Because correction of the LTIP share count error informed the bidders that there were more shares than previously understood, the total aggregate equity value that would allow Vista to meet its hurdle rate translated to a lower price per share. After correcting for the LTIP share count error, the maximum Vista could bid decreased from $24.25 per share to $23.97 per share. On the basis of its revised analysis, Vista submitted a proposed final bid of $23.85 per share, which implied an aggregate equity value of $4.217 billion and an enterprise value of $4.284 billion—each about $21 million lower than the maximum aggregate value that the Vista Committee had authorized earlier in the day.

In the same timeframe, Sponsor B submitted its final proposal of $23.75 per share. Goldman told Vista and Sponsor B that their bids "were not materially differentiated." After further negotiations, Goldman asked both Vista and Sponsor B to submit revised "best and final" offers that evening. Vista raised its bid from $23.85 to $24 per share (Vista's "Final Bid"). Based on the then-current share data, Vista's Final Bid of $24 per share implied an aggregate equity value of $4.244 billion and an aggregate enterprise value of $4.311 billion.

Late in the evening on October 26, 2014, Goldman told Vista that it had won the auction with its Final Bid. Goldman also told Vista that TIBCO's counsel would be in touch with Vista's counsel to finalize a merger agreement, which counsel for Vista and

13

TIBCO had been negotiating during the bidding process. The goal was to sign a merger agreement, if approved by the Board, the next morning.

A few minutes after midnight on September 27, 2014, Vista's counsel emailed Vista's equity commitment letter to TIBCO's counsel (the "Equity Commitment Letter"), which contemplated financing the Merger from Vista's cash on hand. Specifically, in the Equity Commitment Letter, Vista V "commit[ed], conditioned upon (i) satisfaction, or waiver . . . of all conditions precedent . . . and (ii) the contemporaneous consummation of the Merger, to contribute . . . an aggregate amount up to $4,859,000,000 . . . in cash in immediately available funds" to Balboa, the Vista entity formed to make the acquisition.[7]

A "spreadsheet showing the calculations used to arrive at the amount of the commitment" was attached to the email forwarding the Equity Commitment Letter. That spreadsheet shows that the largest component of the $4,859,000,000 commitment amount was the equity value payable to stockholders of $4.244 billion. This amount was calculated by multiplying $24 per share by approximately 176.8 million fully diluted shares outstanding, which number of shares had been derived from the Final Cap Table.

### G. TIBCO Accepts Vista's Offer

On September 27, 2014, the Special Committee and Board held concurrent telephonic meetings to review Vista's Final Bid of $24 per share and Sponsor B's final proposal of $23.75 per share. Representatives of Goldman were in attendance. Goldman presented its opinion on the fairness of Vista's Final Bid to the Board, which was based

---

[7] *Id.* ¶ 83.

on the inaccurate share count data from the Final Cap Table. In its "Summary of Key Economic Terms," Goldman advised the Board and the Special Committee that (i) the implied enterprise value of the proposed Merger was $4.311 billion, (ii) the implied equity value to stockholders was $4.244 billion, (iii) Vista would acquire approximately 176.8 million shares, and (iv) the multiple of enterprise value for the latest twelve months' EBITDA was 18 times. Thus, Goldman's presentation utilized an erroneous share count derived from the Final Cap Table (the same 176.8 million fully diluted share figure Vista had used in making its Final Bid) when opining that $24 per share was fair.

After its presentation, Goldman delivered its written opinion that Vista's Final Bid was fair from a financial point of view (the "Fairness Opinion"). After Goldman's presentation, the Special Committee unanimously recommended that the Board approve the Merger. The Board then unanimously approved the Merger, adopted and approved the Merger Agreement, and recommended that TIBCO's stockholders vote in favor of adoption of the Merger Agreement.

## H.    Key Terms of the Merger Agreement

Later in the morning of September 27, 2014, TIBCO and Vista signed the Merger Agreement, which is governed by Delaware law. The Merger Agreement did not state an aggregate purchase price or an implied equity value. Instead, the Merger Agreement specifically provided that, at the effective time of the Merger, each share of TIBCO

15

common stock would be "automatically converted into the right to receive cash in an amount equal to $24.00, without interest."[8]

The Merger Agreement included a representation from TIBCO entitled "Company Capitalization" (the "Cap Rep"). The Cap Rep stated that there were 163,851,917 outstanding common shares of TIBCO common stock, a figure that expressly included the 4,147,144 unvested restricted shares.[9] The Merger Agreement also accurately listed the other outstanding options and stock-based awards. The Merger Agreement thus accurately provided the share count data needed for Vista to calculate that, based on the $24 per-share price, it would need to acquire 172,670,009 fully diluted shares in the Merger—not the 176,817,153 fully diluted shares it assumed it would need to acquire, as reflected in the spreadsheet attached to the Equity Commitment Letter.[10]

---

[8] Sorrels Aff. Ex. A (Merger Agreement) § 2.7(a)(ii) (Apr. 2, 2015). I take judicial notice of the contents of the Merger Agreement, which is a defined term in the Complaint and referenced throughout the Complaint. *See, e.g.*, *Gerber v. EPE Holdings, LLC*, 2013 WL 209658, at *1 n.12 (Del. Ch. Jan. 18, 2013) (considering limited partnership agreement integral to the complaint when it was "given a defined term and referred to explicitly and implicitly throughout the Complaint.").

[9] Merger Agreement § 3.7(a)-(b).

[10] As explained in the PI Opinion, there were 4,641,716 outstanding options at a weighted average exercise price of $13.41. At an offer price of $24 per share, the share equivalent of these options is 2,282,165 shares. There were also 2,934,638 shares in other unvested stock-based awards and 3,601,289 LTIP shares (after subtracting shares withheld for tax purposes). Thus, the total number of fully diluted options and awards at an offer price of $24 equated to 8,818,092 (2,282,165 + 2,934,638 + 3,601,289 = 8,818,092). When added to the total number of outstanding common shares, this yields a fully diluted number of shares of 172,670,009 (163,851,917 + 8,818,092 = 172,670,009).

The Merger Agreement also provided a termination right to Vista in the event that the Cap Rep was inaccurate at closing and that any inaccuracies, individually or in the aggregate, would require Vista to pay more than $10 million above the product of $24 per share multiplied by the number of fully diluted shares derived from the Cap Rep.[11] This $10 million "cap ceiling" reflects the reality that, for a public company, the share count may change between signing and closing. For example, during this period, options or other stock-based compensation may be granted to newly hired employees or forfeited by terminated employees.

Two provisions of the Merger Agreement were negotiated by TIBCO and Vista as a percentage of an assumed equity value of $4.244 billion: the termination fee in Section 8.3(b)(i) and a liability cap in Section 8.3(f).[12] Section 8.3(b)(i) of the Merger Agreement provides that TIBCO must pay a fee to Vista under certain circumstances where the Merger Agreement is terminated and TIBCO enters into a different transaction within one year (the "Termination Fee"). Vista initially requested a Termination Fee equal to 3.25% of the equity value of the Merger, but TIBCO negotiated the fee down to 2.75% of the equity value of the Merger. Section 8.3(b)(i) of the Merger Agreement thus provides for a Termination Fee of $116,700,000, which, while not expressed as such in the Merger Agreement, is equal to 2.75% of an assumed equity value of $4.244 billion (rounded to the nearest $10,000).

---

[11] Merger Agreement §§ 7.2(a)(iii), 8.1(e).

[12] Compl. ¶¶ 95-98.

Section 8.3(f) of the Merger Agreement defines Vista's maximum liability for any breaches of the Merger Agreement or ancillary agreements (the "Liability Cap"). According to plaintiff, merger agreements often cap acquirer liability at twice the termination fee.[13] Under Section 8.3(f), the Liability Cap is $275,800,000, which (while again not expressed in percentage terms or by reference to any aggregate value in the Merger Agreement) is exactly 6.5% of $4.244 billion, or twice the originally proposed termination fee of 3.25%. Although TIBCO negotiated the Termination Fee down from 3.25% to 2.75%, Vista did not require an equivalent reduction in the Liability Cap.

## I.     TIBCO, Vista, and Goldman Make Statements that the Merger Implies a $4.3 Billion Enterprise Value

On September 29, 2014, Vista and TIBCO announced the Merger in a joint press release. TIBCO, Vista, and Goldman each participated in drafting the joint press release, and had the opportunity to review and sign off on the final version. The joint press release stated that:

> [U]nder the terms of the agreement, TIBCO stockholders will receive $24.00 per share in cash, or a total of approximately $4.3 billion, including the assumption of net debt . . . . The total enterprise value for the transaction represents more than 18 times TIBCO's earnings before interest, depreciation and amortization (EBITDA) for the 12 months ending August 31, 2014.[14]

Although the Equity Commitment Letter provided that Vista would fund the Merger in cash, Vista had intended to obtain debt financing for a portion of the commitment amount. After the announcement of the Merger, Vista prepared

---

[13] *Id.* ¶ 97.

[14] *Id.* ¶ 100.

18

presentations for potential lenders and rating agencies regarding the contemplated debt financing. Vista's draft presentations, up to and after the discovery of the share count error on October 5, 2014, based Vista's commitment amount on the implied enterprise value (approximately $4.3 billion) that had been derived from the erroneous share count. For example, a draft rating agency presentation dated October 14, 2014, stated that "[o]n September 29, 2014, Vista entered a definitive agreement to acquire TIBCO for $4.3 bn in an all-cash transaction inclusive of a refinance of TIBCO's existing $605mm of debt."[15] It was not until October 17, 2014 that Vista's presentation was modified to reflect the enterprise and equity values implied by the correct share count in the Cap Rep.

Up to and after the announcement of the transaction, Goldman similarly expressed its belief that the implied enterprise value of the Merger was $4.311 billion. For example, Goldman's September 29, 2014 "case study"—a marketing document the Goldman deal team prepared to tout the firm's services to current and prospective clients—highlighted that the Merger had an equity value of $4.244 billion, an enterprise value of $4.311 billion, and a multiple of enterprise value to latest twelve months' EBITDA of 18 times.

## J. The Error in the Final Cap Table is Discovered

On Sunday, October 5, 2014, TIBCO's counsel circulated a draft of the proxy statement for the special meeting of the TIBCO stockholders to consider the Merger (the "Preliminary Proxy"), which included enterprise and equity values for the transaction

---

[15] *Id.* ¶ 103.

based on the share count numbers set forth in the Merger Agreement. A Goldman employee reviewed the draft, and commented in an email that "[t]he aggregate value calculation doesn't look right" compared to the number that had been used in Goldman's analysis. An hour later, Goldman emailed TIBCO's counsel to discuss whether, in light of the data in the Final Cap Table, the reduced "equity value and aggregate value [in the Preliminary Proxy] should come out to a different number."[16]

After a series of conversations between TIBCO and Goldman, it was discovered that the capitalization data that was provided to Vista (and Sponsor B) in the Final Cap Table (and its earlier versions) had double-counted 4,147,144 unvested restricted shares. Decreasing the number of the fully diluted shares (at the $24 per share offer) to account for this discrepancy had the effect of reducing the total implied equity value of the transaction by about $100 million, from approximately $4.244 billion to approximately $4.144 billion. Goldman and TIBCO allegedly did not make an immediate inquiry to determine whether Vista or Sponsor B had relied on the incorrect data.[17]

### K. The Board Meets After the Share Count Error is Discovered

On October 11, 2014, after the Board was informed of the share count error, it convened a special meeting to consider the situation. TIBCO management and representatives of Goldman attended the meeting, at which Goldman presented a revised analysis of the Merger with revised capitalization numbers that eliminated the double-

---

[16] *Id.* ¶ 105.

[17] *Id.* ¶ 107.

counting in the Final Cap Table.  In its analysis Goldman assumed that the per-share price would remain constant and reduced (i) the enterprise value from $4.311 billion to $4.212 billion; (ii) the equity value from $4.244 billion to $4.144 billion; (iii) and the EBITDA multiple for the Merger from 18 to 17.6 times EBITDA.

After discussions with the Board, Goldman stated that there was no change to its previous Fairness Opinion.  Following Goldman's presentation, the Board concluded that the revised analysis Goldman had provided did not impact its recommendation in favor of the Merger.  The Preliminary Proxy was revised to include a disclosure addressing the share count error.

On October 14, 2014, after the Board had reaffirmed its approval of the Merger, Vista was informed about the share count error when TIBCO's counsel told Vista's counsel that the equity value in the Preliminary Proxy should be reduced by $100 million. Vista was confused, as it believed that it had agreed to pay $4.311 billion, replying that it "cannot reconcile this."[18]  The next morning, on October 15, 2014, Vista forwarded to Goldman "the email that [Vista] used for the calculation of equity value" in connection with its Final Bid:  a September 26, 2014 email from Goldman to Vista attaching the Final Cap Table, which included the erroneous share count.[19]  Goldman allegedly never told the Board that Vista had admitted relying on the inaccurate capitalization data when

[18] *Id.* ¶ 113.

[19] *Id.*

preparing its Final Bid.[20]  James Ford, COO of Vista, testified in connection with the motion for a preliminary injunction that once he realized the windfall Vista was about to get as a result of the change in share count—which made the deal cheaper and put Vista's expected returns above its hurdle rate—he felt "pleasure."[21]

### L.  The Share Count Error Becomes Public

On October 16, 2014, TIBCO filed the Preliminary Proxy, which disclosed information about the share count error in the "Background of the Merger" section.  It also disclosed that, based on the accurate share count, the $24 per share consideration implied an enterprise value of approximately $4.2 billion, or approximately $100 million less than the $4.3 billion that the Company had initially announced.[22]  The financial press quickly picked up on this issue and remarked on the magnitude of the reduction in equity value arising from the share count error, the minimal disclosure in the Preliminary Proxy regarding the circumstances surrounding the error, and the absence of any indication that TIBCO intended to pursue remedies to recover the lost $100 million for stockholders.

---

[20] *Id.* ¶¶ 114, 119.

[21] *Id.* ¶ 122.

[22] *See* TIBCO Software Inc., Preliminary Proxy Statement (Schedule 14/A), at 37-38 (Oct. 16, 2014).  I take judicial notice of the contents of the Preliminary Proxy, which are not subject to reasonable dispute.  *See, e.g.*, *In Re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 n.9 (Del. 1995) ("Despite the fact that a SEC filing may constitute hearsay with respect to the truth of the matters asserted therein, courts may consult these documents to ascertain facts appropriate for judicial notice under D.R.E. 201.").

**M.     The Board Further Considers the Share Count Error**

On October 23, 2014, the Board met telephonically to further discuss the share count error. Special Committee member West stated that, at the time of the October 23 meeting, "[t]here wasn't certainty about how the error had occurred."[23] According to the Complaint, no member of the Board ever asked Goldman (i) how the share count error was made; (ii) whether it was Goldman's fault or not; (iii) whether Goldman had discussed with Vista the overstated share count, or its implication for the Merger's terms; or (iv) whether Vista should or would pay the full $4.244 billion that the Board had thought it had secured for stockholders.[24]

Plaintiff alleges that Goldman never informed the Board that, over a week earlier on October 15, 2014, Vista had acknowledged that the inaccurate share count data was built into its Final Bid, and that the absence of this information is confirmed by the minutes of the October 23 Board meeting, which state that "it was still unknown if either Vista or Sponsor B used an incorrect share count in arriving at their per share bids."[25] Special Committee member West testified that the lack of this information was a motivating factor for deciding not to challenge Vista on the aggregate purchase price, saying: "One of [the options] was to go back to Vista . . . with [the] context [of] not really knowing what Vista and/or [Sponsor B] may or may not have done in terms of

---

[23] Compl. ¶ 117

[24] *Id.* ¶ 118

[25] *Id.* ¶ 119.

negotiation and not knowing what Goldman Sachs said . . . .  It was unclear to us who used what data, and so at that point – that's the starting point for us."[26]

The Board did not learn that Vista had relied on the erroneous share count, and that Goldman knew that Vista had relied on the erroneous share count, until this litigation was relatively advanced.  Specifically, in its brief opposing plaintiff's motion for a preliminary injunction, the Board wrote that "Goldman *apparently* also discussed the issue with Vista, which had *apparently* relied upon the" inaccurate share count.[27]  At oral argument on that motion, the Board's counsel confirmed that the Board only learned the truth about Vista's admitted reliance during the litigation.[28]

On October 29, 2014, TIBCO scheduled a December 3, 2014 special meeting for stockholders to consider the Merger.  The stockholders approved the Merger at that meeting, and the Merger closed on December 5, 2014.[29]

### N.    Goldman's Transaction Fee

Goldman was paid a total of $47.4 million for its services to TIBCO, about 99% of which ($46.9 million) was contingent on the closing of the Merger.  Goldman's fee was 1% of the "aggregate consideration" for any transaction where common stockholders received up to $24.50 per share (with a higher-valued transaction resulting in a greater percentage fee).   "Aggregate consideration" was defined in Goldman's Engagement

[26] *Id.* ¶ 120.

[27] *Id.* ¶ 121.

[28] Tr. of Oral Arg. 76 (Nov 21, 2014).

[29] Compl. ¶¶ 14, 123.

Letter as: "[i]n the case of the sale, exchange or purchase of the Company's equity securities, the total consideration paid for such securities (including amounts paid to holders of options, warrants and convertible securities, net of the exercise price thereof)."[30] Goldman's $47.4 million dollar fee thus was calculated based on an aggregate consideration of $4.74 billion dollars, which included the $600 million principal amount of TIBCO 2.25% Convertible Senior Notes.

Plaintiff contends that Goldman should not have been entitled to any fee on the amount of the convertible notes because (i) Vista did not agree to purchase the convertible notes as part of the Merger, and thus no consideration was paid to the convertible noteholders in the Merger, and (ii) in any event, Goldman was only entitled to a fee on 1% of that amount "net of the exercise price thereof," and no noteholder received compensation exceeding the exercise price of the notes.[31] Plaintiff further contends that Vista shared this understanding because, after obtaining the relevant language from the Engagement Letter and updating its financial model to reflect the information from the Engagement Letter, Vista accounted for no payment to Goldman related to the $600 million in convertible notes.[32] Vista did not challenge Goldman's inclusion of the value of the convertible notes, however, in its final calculation of its fee.

---

[30] *Id.* ¶ 128.

[31] *Id.* ¶¶ 130-131.

[32] *Id.* ¶ 134.

25

### O. Procedural History

On October 6, 2014, the first of seven putative class action lawsuits challenging the Merger was filed in this Court. On November 5, 2014, plaintiff filed his initial complaint seeking to enjoin the closing of the Merger until the Merger Agreement was reformed to reflect an additional $100 million in consideration for the equity of TIBCO. Plaintiff also asserted, among other claims, a breach of fiduciary duty claim against the Board for failing to try to capture the $100 million for TIBCO's stockholders, and aiding and abetting claims against Vista and Goldman. On November 8, 2014, I granted plaintiff's motion for consolidation and appointment as lead counsel, and his motion for expedited proceedings.

On November 16, 2014, plaintiff filed an amended complaint, which added TIBCO as a defendant solely as a necessary party for the reformation claim, and added unjust enrichment claims against Vista and Goldman. On November 21, 2014, I heard the motion for a preliminary injunction, which was denied on November 25, 2014.

On March 10, 2015, plaintiff filed the Verified Second Amended Class Action Complaint (as defined above, the "Complaint"). In April 2015, the defendants filed motions to dismiss. On the day of argument, July 23, 2015, plaintiff voluntarily dismissed his aiding and abetting claim against Vista (Count III).

## II. LEGAL ANALYSIS

With the voluntary dismissal of Count III, six claims remain that are the subject of defendants' motions to dismiss: (1) reformation of the Merger Agreement (Count I); (2) breach of fiduciary duty against the Director Defendants (Count II); (3) aiding and

abetting against Goldman (Count IV); (4) professional malpractice and professional negligence against Goldman (Count V); (5) unjust enrichment against Vista (Count VI); and (6) unjust enrichment against Goldman (Count VII).

## A.    Legal Standard

Under Court of Chancery Rule 12(b)(6), a motion to dismiss for failure to state a claim must be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[33]  "In determining whether a pleading meets this minimal standard, this Court draws all reasonable inferences in the plaintiff's favor, accepts all well-pleaded factual allegations as true, and even accepts 'vague allegations in the Complaint as 'well pleaded' if they provide the defendant notice of the claim.'"[34]

For Count I, which alleges the existence of a mutual mistake as the basis for reformation of the Merger Agreement, Court of Chancery Rule 9(b) is implicated.  It requires that "the circumstances constituting . . . mistake shall be stated with particularity."  In the context of a reformation claim, Rule 9(b) requires that "the facts upon which a plaintiff relies in pleading reformation must be set forth with at least some particularity in order to put the defendant on notice of what is charged against him, but

---

[33] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011); *see also Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013).

[34] *Seinfeld v. Slager*, 2012 WL 2501105, at *2 (Del. Ch. June 29, 2012) (quoting *Cent. Mortg. Co.*, 27 A.3d at 536).

does not go so far as to require a textbook pleading or the use of specific words or phrases."[35]

### B. Count I: Reformation Due to Mutual Mistake

Count I of the Complaint seeks reformation of the Merger Agreement due to an alleged mutual mistake. As executed, the Merger Agreement expressly required Vista to pay $24 per share to acquire the common stock of TIBCO.[36] Based on the share count in the Cap Rep, which was accurate, this implied an enterprise value for TIBCO of approximately $4.211 billion and an equity value of approximately $4.144 billion. According to plaintiff, the Merger Agreement should be reformed "to reflect [an implied enterprise value] of $4.311 billion and [an implied equity value] of $4.244 billion to stockholders, which on a per-share basis equals approximately $24.57."[37]

#### 1. The Legal Standard Governing the Reformation Claim

Reformation "is an equitable remedy which emanates from the maxim that equity treats that as done which ought to have been done."[38] The Court of Chancery has

---

[35] *Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *10 (Del. Ch. Dec. 7, 2012) (internal citations and quotation marks omitted).

[36] Merger Agreement § 2.7(a)(ii) (each TIBCO share will be "automatically converted into the right to receive cash in an amount equal to $24.00, without interest.").

[37] Compl. ¶ 153. At times, when asserting that Vista intended to pay $4.244 billion for the equity of TIBCO, plaintiff also asserts that Vista intended to pay an enterprise value of $4.311 billion. Because one figure mathematically goes hand in hand with the other, I analyze plaintiff's contentions by referring only to the equity value for simplicity.

[38] *Interim Healthcare, Inc. v. Sherion Corp.*, 2003 WL 22902879, at *6 (Del. Ch. Nov. 19, 2003, revised Dec. 1, 2003) (quoting 27 *Williston on Contracts* § 70:19 (4th ed. 2003)).

28

equitable jurisdiction to reform the terms of a written contract "in order to express the 'real agreement' of the parties involved."[39] Reformation is not an equitable license for the Court to write a new contract at the invitation of a party who is unsatisfied with his or her side of the bargain; rather, it permits the Court to reform a written contract that was intended to memorialize, but fails to comport with, the parties' prior agreement.[40] As Professor Williston explains:

> It is not enough that the parties would have come to a certain agreement had they been aware of the actual facts.
>
> Reformation requires an antecedent agreement, which the written instrument attempts to express. However, any mistake must have been in the drafting of the instrument, not in the making of the contract. An instrument will not be reformed due to a mere misunderstanding of the facts, or a mistake as to an extrinsic fact which, if known, would probably have induced the making of a different contract or no contract at all. If there has been any misunderstanding between the parties, or a misapprehension by one or both, so that there is no mutuality of assent, then the parties have not made a contract, and neither will the court do so for them.[41]

---

[39] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002) (quoting *Colvocoresses v. W.S. Wasserman Co.*, 28 A.2d 588, 589 (Del. Ch. 1942)).

[40] *See Collins v. Burke*, 418 A.2d 999, 1002-03 (Del. 1980) ("Reformation is not a mandate to produce a reasonable result . . . . Rather, it is based on intention."); *see also In re Estate of Justison*, 2005 WL 217035, at *10 (Del. Ch. Jan. 21, 2005) ("The purpose of reformation is to make an erroneous instrument express correctly the intent of, or the real agreement between, the parties.").

[41] 27 *Williston on Contracts* § 70:19, *quoted in Interim Healthcare*, 2003 WL 22902879, at *7; *see also Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del. 1990) (quoting 3 *Pomeroy's Equity Jurisprudence*, § 870 (5th ed.)) ("Reformation is appropriate, when an agreement has been made . . . as intended by all the parties interested, but in reducing such agreement or transaction to writing, . . . through the mistake common to both parties, . . . the written instrument fails to express the real agreement or transaction.").

A claim for reformation must be proven by clear and convincing evidence.[42]  As the Delaware Supreme Court stated in *Cerberus International, Ltd. v. Apollo Management, L.P.*, the leading case on reformation under Delaware law, "the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement."[43]  The clear and convincing evidence standard has been described as requiring "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are 'highly probable.'"[44]  This heightened requirement enables the Court to compare the prior agreement and the executed contract in order to determine "*exactly* what terms" need to be reformed.[45]  It also "preserve[s] the integrity of written agreements by making it difficult" to modify executed contracts.[46]

The Supreme Court's decision in *Cerberus* provides a three-part framework to analyze a claim for reformation.  In *Cerberus*, a financial sponsor (Apollo) acquired a target company (MTI) under a merger agreement that set forth a formula reflecting the

---

[42] *Cerberus*, 794 A.2d at 1152.

[43] *Id.* at 1151-52.

[44] *Id.* at 1151 (quoting *In re Rowe*, 566 A.2d 1001, 1003 (Del. Jud. 1989)).

[45] *See Collins*, 418 A.2d at 1002 (emphasis added); *see also Hob Tea Room v. Miller*, 89 A.2d 851, 857 (1952) ("Unless there was a clear understanding with which the formal contract conflicts, there is, of course, no comparative standard upon which to base a reformation, and the contract as executed must stand.").

[46] *See Joyce v. RCN Corp.*, 2003 WL 21517864, at *3 (Del. Ch. July 1, 2003); *cf. ev3, Inc. v. Lesh*, 103 A.3d 179, 181 n.3 (Del. 2014) ("Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce.").

total consideration that MTI stockholders would receive: $65 million, less transaction costs, and *less* proceeds from the sale of certain options and warrants. After the transaction closed, the plaintiffs filed suit and alleged that the executed contract contained a drafting error that warranted reformation because Apollo and MTI actually had agreed to a different purchase price: $65 million, less transaction fees, *plus* the proceeds from the sale of the options and warrants. According to the Supreme Court, the plaintiffs would need to prove three facts (each by clear and convincing evidence) to justify reformation of the purchase price under the doctrine of mutual mistake: "(i) MTI thought that the merger agreement gave MTI's stockholders the proceeds of the options and warrants; (ii) . . . Apollo was also similarly mistaken . . .; and (iii) that MTI and Apollo had specifically agreed that the proceeds of the options and warrants would go to MTI's stockholders."[47]

Applying this analytical framework, to prevail on Count I, plaintiff here must demonstrate all three of the following facts: (i) that Vista thought that the Merger would be consummated at an aggregate equity value of $4.244 billion; (ii) that TIBCO also thought that the Merger would be consummated at an aggregate equity value of $4.244 billion; and (iii) that Vista and TIBCO *had specifically agreed* before signing the Merger Agreement that the Merger would be consummated at an aggregate equity value of $4.244 billion. Given that the current procedural posture is a motion to dismiss, which implicates Court of Chancery Rules 9(b) and 12(b), plaintiff's burden on this motion is to

---

[47] *Cerberus*, 794 A.2d at 1152.

allege particularized facts concerning the circumstances of a mutual mistake from which it is reasonably conceivable that plaintiff would be able to establish each of these elements by clear and convincing evidence.[48]

## 2. The Findings in the PI Opinion

In the PI Opinion, I found that plaintiff had demonstrated a reasonable probability that he could successfully prove each the first two elements of the *Cerberus* test, but not the third element. Specifically, as to the first two elements, I found that plaintiff had shown both "a reasonable probability that he could prove, by clear and convincing evidence, that Vista mistakenly believed it would pay $4.244 billion in total to acquire the equity of TIBCO in the Merger"[49] and "a reasonable probability of success in establishing, by clear and convincing evidence, that TIBCO mistakenly believed that Vista would pay $4.244 billion in total to acquire the equity of TIBCO in the Merger."[50]

---

[48] *See, e.g.*, *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *5 (Del. Ch. Feb. 18, 2015) (on motion to dismiss claim for specific performance, also subject to "clear and convincing evidence" burden of proof, "[t]he legal standard . . . [is] whether it is reasonably conceivable that Sunview could establish a right to specific performance by clear and convincing evidence"); *see also Pharmathene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at *15 ("[I]t is reasonably conceivable that PharmAthene could show the LATS contains all of the material and essential terms to be incorporated into the final license agreement. For essentially the same reasons, I consider it conceivable that PharmAthene also could establish that proposition by clear and convincing evidence [.]").

[49] *In re TIBCO Software Inc. S'holders Litig.*, 2014 WL 6674444, at *17 (Del. Ch. Nov. 25, 2014).

[50] *Id.*

The third element is where plaintiff came up short at the preliminary injunction phase of this case. Because this element remains the heart of the dispute on the present motion, I set forth below the analysis in the PI Opinion on this element to frame the issue:

> Despite the evidence reflecting that Vista and TIBCO both mistakenly believed before signing the Merger Agreement that Vista would pay $4.244 billion in total to acquire the equity of TIBCO, Plaintiff has not, in my opinion, demonstrated a reasonable probability that he could prove by clear and convincing evidence that Vista and TIBCO *had specifically agreed* that the Merger would be at an aggregate equity value of $4.244 billion. In other words, Plaintiff has not shown a reasonable probability of proving, by clear and convincing evidence, that the Merger Agreement does not accurately reflect the parties' meeting of the minds on the essential economic term of the Merger: a deal at $24.00 per share.

> To the contrary, key evidence from September 26 and 27 strongly demonstrates that what Vista ultimately offered and what TIBCO ultimately accepted was expressed in terms of dollars per share and not in terms of an aggregate equity value. The three documents that evidence their agreement to a transaction based on a per-share price are (1) Vista's September 26 bid letter conveying the $24.00 per share offer, (2) the September 27 minutes reflecting the Board's acceptance of the $24.00 per share offer, and (3) the Merger Agreement Vista and TIBCO executed on September 27, which sets forth the consideration to be received by TIBCO stockholders as $24.00 per share. All of these documents reflect an agreement to a transaction based on a per-share figure, and not based on an aggregate equity value. This per-share agreement is consistent with the way in which Goldman, on behalf of TIBCO, was conducting the auction: on a per-share basis. Based on the preliminary record, at no point in time did Vista offer a specific aggregate equity value, and at no point in time did the Board accept a specific aggregate equity value.

> Instead, the sale process reflects that Vista and TIBCO understood that the number of fully diluted shares to be acquired in a transaction, and thus the aggregate equity value, was a bit of a moving target. For example, the fact that Goldman had circulated different cap tables for the Company on August 29, on September 21, and on September 26, demonstrates that Vista and TIBCO understood that, until there was a definitive agreement, the number of fully diluted shares was changing, even if only modestly. Indeed, the Merger Agreement reflects that the parties recognized that the number of fully diluted shares might further change between signing and

33

closing. Specifically, the Merger Agreement affords Vista a termination right if any inaccuracies in the Cap Rep at closing would increase Vista's total acquisition cost (calculated pursuant to the terms of the Merger Agreement) by more than $10 million.

Notably, the Merger Agreement does not provide that the consideration of $24.00 per share would change in proportion to any increase in the share count after signing. Thus, it is difficult to see how Vista and TIBCO could be said to have specifically agreed to a fixed aggregate equity value of $4.244 billion, as Plaintiff claims, when they agreed in the Merger Agreement that the aggregate equity value could *change*.

Vista argues that, rather than specifically agreeing on an aggregate equity value, Vista and TIBCO agreed to allocate the risk of the Merger's aggregate equity value through the representations and warranties, closing conditions, and termination rights set forth in the Merger Agreement. I agree. "Merger contracts are heavily negotiated and cover a large number of specific risks explicitly." Contractual representations and warranties "serve [this] important risk allocation function." Here, through the Cap Rep and Vista's corresponding termination right, the parties did just that in the Merger Agreement with respect to the aggregate equity value in the Merger. TIBCO also disclosed this concept to its stockholders in the proxy statement.

\* \* \* \* \*

In sum, on the preliminary record before me, Plaintiff has failed to show a reasonable probability that he could prove, by clear and convincing evidence, that there was a specific agreement between Vista and TIBCO for $4.244 billion in aggregate equity value. The Merger Agreement accurately reflects, on this record, the meeting of the minds on the essential economic term of the Merger: $24.00 per share.[51]

---

[51] *Id.* at \*17-19.

### 3. The Parties' Contentions

Vista, arguing on behalf of all defendants for Count I, advances two theories for dismissal of the reformation claim. The first theory is premised on standing.[52] The second theory concerns the sufficiency of the allegations to state a claim for reformation. Because I resolve this motion based on the sufficiency of the allegations for the reformation claim, I do not address Vista's standing arguments.

Vista does not dispute the sufficiency of the allegations of the Complaint with respect to the first two of the three elements of the reformation claim. That is, Vista does not dispute that the Complaint sufficiently alleges facts demonstrating that, at the time the Merger Agreement was signed, (i) Vista thought that the Merger would be consummated at an aggregate equity value of $4.244 billion, and (ii) TIBCO had the same mistaken belief.[53] Vista argues instead that Count I is "facially flawed because it fails to plead

---

[52] Vista argues that the reformation claim must be dismissed because it is derivative and because plaintiff failed to make a demand on the Board. Vista argues in the alternative that, even if the claim is direct, it must be dismissed because plaintiff represents a class of third-party beneficiaries to the Merger, whose rights are specifically disclaimed by the Merger Agreement.

[53] The allegations as to these two elements in Complaint are substantially the same as the record that was before the Court at the time of the PI Opinion. Thus, if these elements had been contested, I would hold for the same reasons explained in the PI Opinion that the allegations concerning these two elements are sufficient to survive a motion to dismiss. *See, e.g.*, *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 n.67 (when preliminary injunction motion "was decided on a record identical to that [the Court is] permitted to consider" on motion for judgment on the pleadings, the Court "need not revisit [the] examination of the merits other than to indicate [its] agreement with [the] conclusion"); *In Re Wheelabrator Techs., Inc. S'holders Litig.*, 1992 WL 212595, at *3 (Del. Ch. Sep. 1, 1992) (where record had not changed since the court decided that a disclosure claim was without merit on a motion for preliminary injunction, court relied on its prior analysis in dismissing the same claim on a 12(b)(6) motion).

facts sufficient to establish that Vista and TIBCO had ***specifically agreed*** before signing the Merger Agreement that the merger would be consummated at an aggregate equity value of $4.244 billion."[54] According to Vista, plaintiff cannot plead such facts "because the Merger Agreement accurately reflects that the only agreement ever reached regarding the consideration to be paid to TIBCO's stockholders—$24.00 per share."[55]

Plaintiff responds that "the Complaint sufficiently pleads that the parties had an agreement to complete a transaction at [an enterprise value of $4.3 billion] and [an equity value of $4.244 billion] and, due to a mutual mistake regarding TIBCO's share count, the Merger Agreement did not accurately capture those material terms of the parties' intended agreement."[56] More specifically, plaintiff contends there are nine reasons the Complaint sufficiently alleges the existence of an antecedent agreement:

1. When Vista made its Final Bid, "it intended to offer and believed it was conveying to the Board an offer to pay" an equity value of $4.244 billion, "even if it was articulated on a per-share basis."

2. Vista relied on the mistaken share count in the Final Cap Table in articulating its Final Bid on a per-share basis.

3. Vista offered and expected to pay $4.244 billion to buy TIBCO in its entirety.

4. Vista agreed in its Equity Commitment Letter to provide $4.244 billion to the TIBCO stockholders.

---

[54] Vista's Op. Br. 21.

[55] *Id.*

[56] Pl.'s Ans. Br. 40.

5. In its Fairness Opinion, Goldman opined on a transaction with an equity value of $4.244 billion.

6. The Board "accepted the Final Bid," believing that it was approving an offer with an equity value of $4.244 billion.

7. The Termination Fee and Parent Liability Cap in the Merger Agreement were calculated as a percentage of an assumed equity value of $4.244 billion.

8. After signing the Merger Agreement, defendants described the Merger internally and to third parties as having and an equity value of $4.244 billion.

9. After they discovered the share count error, defendants were "stunned that the Merger Agreement did not provide $4.244 billion to TIBCO's stockholders."[57]

Although numerous, these nine reasons have one thing in common: none of them pleads with particularity facts from which it reasonably can be inferred that Vista and TIBCO had specifically agreed before they signed the Merger Agreement that Vista would pay anything other than $24 per share to acquire the equity of TIBCO as reflected in the Merger Agreement.

### 4. The Complaint Fails to Plead Particularized Facts of an Antecedent Agreement Inconsistent with the Merger Agreement's Price Term

Plaintiffs' nine reasons fall into essentially four categories: (1) evidence of Vista's state of mind, (2) evidence of TIBCO's state of mind, (3) the significance of the Termination Fee and Liability Cap in the Merger Agreement, and (4) statements that were made about the Merger Agreement after the fact. I address each category in turn.

---

[57] *Id.* at 3-4, 41-50.

### a. Contentions 1-4: Vista's State of Mind

The first four contentions each concern Vista's state of mind in making its per-share offer, which plaintiff contends was based on an inaccurate conception of the aggregate value Vista expected to pay to acquire TIBCO. These allegations go to show that Vista made a mistake about how much Vista thought it was bidding and thus provide evidence of the first of the three elements necessary for plaintiff to establish a claim for reformation, *i.e.*, that Vista thought that the Merger would be consummated at an aggregate equity value of $4.244 billion. But these allegations do not demonstrate the existence of a prior understanding between Vista and TIBCO.

Plaintiff alleges, for example, that Vista relied on the inaccurate share count in the Final Cap Table in articulating its Final Bid, meaning that Vista divided the aggregate amount that it intended to pay for the equity ($4.244 billion) by an inaccurate number of shares derived from the Final Cap Table (176.8 million) to determine its Final Bid ($24 per share). Given the Complaint's allegations concerning the methodology Vista used to calculate its per-share bid and how Vista adjusted its per-share bid in reaction to the discovery of the LTIP share count error just before submitting its Final Bid, it is reasonably inferable that Vista based its Final Bid on an aggregate value of $4.244 billion divided by an inaccurate share count. But even giving full credit to these allegations, they do not support the existence of a ***prior agreement between Vista and TIBCO*** that the price to acquire the equity of TIBCO was $4.244 billion, or anything other than $24 per share.

38

Indeed, virtually all the evidence plaintiff cites regarding its first four contentions was internal to Vista and never communicated to TIBCO.[58] The one exception is the Equity Commitment letter, which plaintiff asserts was "incorporated by reference into the Merger Agreement" in Section 4.11 of that agreement.[59] Plaintiff, however, misconstrues the plain meaning of this provision and the Equity Commitment Letter.

Section 4.11 of the Merger Agreement states as follows:

As of the date of this Agreement, Parent [Balboa] has delivered to [TIBCO] true, correct and complete copies of an executed commitment letter, dated as of the date of this Agreement, between [Balboa] and Guarantor [Vista V] (the "Equity Commitment Letter") pursuant to which [Vista V] has committed, subject to the terms and conditions thereof, to invest in [Balboa], directly or indirectly, the cash amounts set forth therein for the purpose of funding up to the aggregate value of the Merger (the "Equity Financing"). The Equity Commitment Letter provides that (A) [TIBCO] is an express third party beneficiary thereof in connection with [TIBCO's] exercise of its rights under Section 9.8(b); and (B) subject in all respects to Section 9.8(b), [Balboa] and [Vista V] will not oppose the granting of an injunction, specific performance or other equitable relief in connection with the exercise of such third party beneficiary rights.[60]

---

[58] Specifically, plaintiff relies on allegations concerning (i) Vista's internal hurdle rate, (ii) its calculation of the aggregate reserve price it could offer given its hurdle rate, (iii) the Vista Committee's authorization of a bid for TIBCO at that aggregate reserve price, (iv) Vista's division of the aggregate reserve price by the erroneous share count to derive a per-share bid, (v) testimony of Vista's COO that it expected to pay $4.244 billion to acquire the equity of TIBCO, and (vi) Vista's concession that it relied on the Final Cap Table when articulating its Final Bid on a per-share basis. *See* Pl.'s Ans. Br. 41-42.

[59] Pl.'s Ans. Br. 43; Tr. of Oral Arg. 91-92 (July 23, 2015).

[60] Merger Agreement § 4.11. Section 9.8(b) provides, in relevant part, that TIBCO "shall have the right to an injunction, specific performance or other equitable remedies in connection with enforcing [Balboa's] and [Merger Sub's] obligations to consummate the Merger and cause the Equity Financing to be funded to fund the Merger (including to cause [Balboa] to enforce the obligations of [Vista V] under the Equity Commitment Letter in order to cause the Equity Financing to be timely completed in accordance with

The Equity Commitment Letter provides that Vista V has committed to contribute to Balboa "an aggregate amount up to $4,859,000,000" in cash.[61] The representation in Section 4.11 of the Merger Agreement says, in essence, that there is an agreement between Vista V and its subsidiary, Balboa, to provide enough cash (up to $4.859 billion) to close the Merger, and that TIBCO is an express third-party beneficiary of that agreement entitled to enforce its rights against both Balboa and Vista V to obtain that cash to close the Merger.[62] What the representation in Section 4.11 does not say is that anything in the Equity Commitment Letter constitutes an agreement between TIBCO and any Vista entity concerning the amount of consideration to be paid for the equity of TIBCO. Nor has plaintiff identified any language in the Equity Commitment Letter reflecting such an agreement.

In discussing Vista's expectation that it would pay $4.244 billion to acquire the equity of TIBCO, plaintiff quotes the following passage from *Williston*: "Legally, for there to be a mistake, there must be a discrepancy between an offeror's state of mind and his offer."[63] This is merely a necessary—but not a sufficient—condition for pleading a claim for reformation. *Williston* also states that "[r]eformation requires an antecedent

_____

and subject to the terms and conditions set forth in the Equity Commitment Letter)." *Id.* § 9.8(b)(i).

[61] Nucum Aff. Ex. 7 at TIBCOM00040820 (May 26, 2015). The Equity Commitment Letter, which is a defined term in the Complaint and is explicitly referred to therein, is integral to the Complaint. *See, e.g.*, *Gerber*, 2013 WL 209658, at *1 n.12.

[62] Merger Agreement § 4.11.

[63] Pl.'s Ans. Br. 41 (quoting 27 *Williston on Contracts* § 70:5).

agreement, which the written instrument attempts to express."[64]   This is the law of Delaware.  As explained above, the Supreme Court in *Cerberus* specifically held that, in addition to showing that counter-parties to an agreement shared a mistaken belief, "the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement."[65]   Particularized allegations of such a "specific prior understanding" are what the Complaint is missing.[66]

### b.  Contentions 5-6:  TIBCO's State of Mind

Plaintiff's fifth and sixth contentions are that Goldman opined in its Fairness Opinion that Vista's Final Bid (stated as $24 per share) equated to an implied equity value of $4.244 billion in the aggregate, and that the Board accepted that bid believing that it was approving a transaction that would yield an equity value of $4.244 billion for TIBCO's stockholders.  Both of these contentions address TIBCO's state of mind.  Specifically, these allegations provide evidence, as I found preliminarily in the PI

---

[64] 27 *Williston on Contracts* § 70:19.

[65] *Id.* at 1151-52.

[66] Plaintiff asks the Court, in essence, to assume there must have been a prior agreement between the parties on the theory that the determination of a per-share price goes hand-in-hand with determining what a buyer is willing to pay for a company in the aggregate as a matter of industry custom (Pl.'s Ans. Br. 44-45 & n.58), citing *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC,* 2012 WL 1869416 (Del. Ch. May 16, 2012), for the proposition that industry custom should be considered in deciding a reformation claim.  *Breckenridge* is of no help to plaintiff.  In that case, unlike here, the Court found that terms stated in an email exchange between the parties constituted "a specific prior contractual understanding that provides the necessary foundation for reformation."  *Id.* at *13.  The Court applied the established industry meaning of certain terms simply to construe the email exchange—not to assume the existence of an antecedent agreement in the absence of any actual evidence of one.

Opinion, that TIBCO mistakenly believed that Vista would pay $4.244 billion in total to acquire the equity of TIBCO in the Merger when it considered Vista's Final Bid.[67] These allegations are essentially the flip-side of the plaintiff's contentions concerning Vista's mistaken belief. But for the same reasons discussed above regarding Vista's state of mind, these allegations regarding TIBCO's state of mind do not provide evidence of a specific prior understanding between Vista and TIBCO that Vista would pay anything other than $24 per share to acquire the equity of TIBCO.

### c. Contention 7: the Termination Fee and Liability Cap

Plaintiff's seventh contention is that the Termination Fee and Liability Cap in the Merger Agreement "were undisputably calculated as a percentage of" an implied equity value of $4.244 billion and, therefore, it would have made no sense to include them in the Merger Agreement if the parties had intended a transaction that would result in a lower implied equity value.[68] Plaintiff cites for support minutes from the Board meeting on October 23, 2014, which note that the Termination Fee and Liability Cap "implied an enterprise value for the transaction that reflected an overstated capitalization."[69]

Even if one assumes plaintiff has sufficiently alleged a prior understanding concerning those provisions that is inconsistent with what is stated in the Merger

---

[67] *TIBCO*, 2014 WL 6674444, at *17.

[68] Pl.'s Ans. Br. 45-46.

[69] *Id.* at 45.

Agreement,[70] such allegations do not demonstrate a specific prior understanding on the term for which reformation is sought here, namely the per-share price specified in Section 2.7(a)(ii) of the Merger Agreement. On this issue, plaintiff admits that, with the exception of the initial nonbinding indication of interest Vista expressed on August 30,[71] Vista only bid on a per-share basis without expressing to TIBCO any assumption about the number of shares it expected to pay for in conjunction with its bids.[72] Put differently, plaintiff does not (and cannot) allege that Vista ever submitted a bid for a $4.244 billion implied equity value. To the contrary, plaintiff acknowledges (as he must) that "Vista's Final Bid was necessarily expressed in the 'per share' language needed to communicate with stockholders and the market."[73]

In sum, for me to find a specific prior understanding concerning the price term in the Merger Agreement, there must have been an offer by Vista to purchase all the TIBCO shares on the basis of an implied equity value of $4.244 billion, and an acceptance of such an offer by TIBCO. The Complaint, however, does not allege the existence of any such offer or acceptance.

---

[70] As I noted in the PI Opinion, plaintiff may have been able to establish that the Termination Fee and Liability Cap provisions should be reformed based on the fact that the parties negotiated those two terms as a percentage of an assumed $4.244 billion equity value, but plaintiff did not seek such relief. *TIBCO*, 2014 WL 6674444, at *19 n.166.

[71] *See* Compl. ¶ 41 ("Vista's initial [August 30] proposal included an express assumption about the approximate number of shares of outstanding common stock and stock-based awards to be acquired.").

[72] *See* Compl. ¶¶ 48, 73-74.

[73] Pl.'s Ans. Br. 15.

43

#### d. Contentions 8-9: Post-Agreement Statements by Parties

Plaintiff's final two contentions concern events occurring after the Merger Agreement was signed, specifically (1) statements Vista, TIBCO and Goldman made internally and to third parties before the share count error was discovered reflecting that they each (mistakenly) understood the implied equity value of the transaction to be $4.244 billion,[74] and (2) defendants' reactions after discovering the share count error, in particular Goldman's presentation of a revised fairness opinion at a reduced equity value ($4.144 billion) from what Goldman previously had believed ($4.244 billion), and the Board's consideration of the same. By definition, neither of these events, which occurred *after* the Merger Agreement was signed, provides evidence of an understanding reached *before* the Merger Agreement was signed. The statements Vista, TIBCO and Goldman made before the share count error was discovered concerning the value of the transaction simply provide further evidence along the lines discussed above that each of the defendants held a mistaken belief concerning the equity value implied by Vista's Final Bid of $24 per share.

Focusing on events occurring after the share count error was discovered, plaintiff argues that "[i]f the Merger Agreement did not contain a reformable mistake altering the effect of the parties [sic] intended agreement, Goldman would not have needed to redo its

---

[74] The statements to third parties that plaintiff references consist of Vista's statements to rating agencies and lending sources that it would be acquiring TIBCO for "$4.3 bn.," Goldman's September 29, 2014 "case study" describing the Merger as having a $4.244 equity value, and the joint press release that Vista and TIBCO issued to announce the transaction, describing it as a $4.3 billion deal. Pl.'s Ans. Br. 46.

analysis or opine that the [Merger] was fair."[75]  This is a non sequitur.  The legal standard for establishing a claim of reformation is exacting and has no bearing on whether or not it would be prudent for a Board and its financial advisor to revisit their analysis of a transaction after discovering that one of their assumptions was mistaken.  Indeed, it would have been irresponsible for them not to undertake that inquiry.

\* \* \* \* \*

Taking all nine of the above contentions into account, plaintiff asserts that the facts here "are very similar" to those that caused the Supreme Court in *Cerberus* to find triable issues that could sustain a claim for reformation.[76]  I disagree.  In *Cerberus*, the Court identified evidence of an actual prior understanding between the parties on the specific deal term for which reformation was sought (*i.e.,* to reform a merger agreement so that the selling stockholders would receive the proceeds from certain options and warrants).  Specifically, the trial record in *Cerberus* contained evidence that the seller's CEO had stated in writing before signing the merger agreement that "having the proceeds from the options and warrants go to MTI's stockholders was a condition to further negotiations," to which buyer's CEO "responded in his handwritten note on that writing: 'This looks fine.'"[77]  The Supreme Court went on to explain that "[a]bsent any evidence that this term was eliminated in the negotiation (and there is none on this record), it is

---

[75] Pl.'s Ans. Br. 47.

[76] *Id.* at 49.

[77] *Cerberus*, 794 A.2d at 1153.

45

certainly a permissible inference that the parties had a prior agreement relative to the proceeds from the options and warrants."[78]

Here, despite having the benefit of discovery, plaintiff has failed to identify any similar evidence of a specific prior understanding inconsistent with the price term in the Merger Agreement. To repeat, the Complaint is devoid of any allegation that Vista specifically offered to pay $4.244 billion (or any other aggregate amount) for the equity of TIBCO or that TIBCO accepted any offer expressed in terms of an aggregate value. Instead, as plaintiff admits, Vista's Final Bid was expressed in terms of a per-share price of $24 unaccompanied by any express assumption about the implied equity value of that bid. The final Merger Agreement accurately reflected the per-share price Vista offered and that TIBCO accepted, and accurately reflected (in the Cap Rep) the number of TIBCO's shares outstanding on a fully diluted basis.

The first sentence of the *Cerberus* decision framed the issue to be analyzed as one "based upon an alleged mistake of fact in the drafting" of a merger agreement.[79] In recognition of the need for caution before a court will step in to modify the unambiguous terms of a contract, one negotiated here by highly sophisticated parties, the Supreme Court articulated a strict three-part analysis requiring proof of a specific prior understanding by clear and convincing evidence. This stringent test is consonant with substantial Delaware authority recognizing that reformation is only available when there

---

[78] *Id.*

[79] *Id.* at 1143.

46

has been a "mistake" in reducing a specific agreement of the parties to writing.[80]

Although I am sympathetic to plaintiff's position given the apparent willingness of Vista to spend an additional $100 million to acquire the equity of TIBCO, the bottom line fact remains that plaintiff has failed to allege, as he must to sustain a claim for reformation, facts demonstrating the existence of an antecedent agreement inconsistent with the price term of the Merger Agreement. Accordingly, Count I fails to state a claim for relief.

## C. Count II: Breach of Fiduciary Duty against the Director Defendants

Count II of the Complaint asserts that the Director Defendants breached their fiduciary duties to TIBCO by failing to correct, or even to approach Vista in an attempt to correct, the share count error once it was discovered, and by failing to adequately inform themselves in the wake of this discovery. Plaintiff argues that these failures violated the Director Defendants' duty under *Revlon* to obtain the highest value reasonably obtainable for the Company in a change of control transaction.

In *Malpiede v. Towson*, the Delaware Supreme Court explained that enhanced scrutiny under *Revlon* does not change the nature of the fiduciary duties owed by directors:

---

[80] *See Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del. 1990) ("[R]eformation is appropriate, when an agreement has been made . . . but in reducing such agreement or transaction to writing . . . the written instrument fails to express the real agreement or transaction.") (citation omitted); *Interim Healthcare*, 2003 WL 22902879, at *7 ("[R]eformation is appropriate when the parties mistakenly believed that the written instrument properly memorialized their agreement when, in fact, it did not."); *Lions Gate Entm't Corp. v. Image Entm't Inc.*, 2006 WL 1668051, at *8 (Del. Ch. June 5, 2006) ("The purpose of reformation is to make an erroneous instrument express correctly the intent of, or the real agreement between, the parties.") (citation omitted).

> *Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply. Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise. Although the Revlon doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale.[81]

More recently, in *In re Cornerstone Therapeutics Inc., Stockholder Litigation*, the Supreme Court held that where, as here, a plaintiff seeks only monetary damages, the plaintiff "must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it *Revlon*, *Unocal*, the entire fairness standard, or the business judgment rule."[82]

The Director Defendants are exculpated from monetary liability for a breach of the duty of care under TIBCO's Certificate of Incorporation.[83] Plaintiff concedes, furthermore, that the Complaint "does not allege that the Director Defendants were interested or lacked independence."[84] Thus, to state a non-exculpated claim for breach of

---

[81] 780 A.2d 1075, 1083-84 (Del. 2001).

[82] 115 A.3d 1173, 1175-76 (Del. 2015).

[83] Article 9(a) of TIBCO's Amended and Restated Certificate of Incorporation states: "To the fullest extent permitted by the Delaware General Corporation Law as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." Sorrels Aff. Ex. B, Art. 9(a) (Apr. 2, 2015). "The court may take judicial notice of the certificate in deciding a motion to dismiss." *McPadden v. Sidhu*, 964 A.2d 1262, 1273 n.28 (Del. Ch. 2008).

[84] Pl.'s Ans. Br. 67 n. 134.

the fiduciary duty of loyalty against the Director Defendants, plaintiff must plead facts sufficient to demonstrate that that they acted in bad faith.

The standard for demonstrating that disinterested directors acted in bad faith is a high one. As the Supreme Court held in *Lyondell*:

> Only if [the directors] knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty. . . . Instead of questioning whether disinterested, independent directors did everything that they (arguably) should have done to obtain the best sale price, the inquiry should [be] whether those directors utterly failed to attempt to obtain the best sale price.[85]

In so holding, the Supreme Court quoted with approval then Vice-Chancellor Strine's observation that "[i]n the transactional context, a very extreme set of facts would seem to be required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."[86] Plaintiff acknowledges the high bar to pleading bad faith. According to plaintiff, he must at least "show that the 'fiduciary's actions were so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"[87]

Plaintiff advances two theories in support of its fiduciary duty claim, specifically, that (1) "the Board did not even *attempt* to recover the $100 million in consideration that Vista had agreed to pay TIBCO," and (2) the Board "failed to adequately inform itself

---

[85] *Lyondell*, 970 A.2d at 244.

[86] *Id.* at 243 (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654-55 (Del. Ch. 2008)).

[87] Pl.'s Ans. Br. 71 (quoting *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, *10 (Del. Ch. Jan. 13, 2013) (internal quotations omitted)).

49

about the circumstances of the Share Count Error and what options and strategies it had to potentially capture some or all of the $100 million."[88] In my opinion, neither theory alleges sufficient facts to sustain a duty of loyalty claim for bad faith conduct, but it is reasonably conceivable that the allegations underlying the second theory would sustain a duty of care claim for which the Director Defendants would be exculpated but that could form the predicate breach for an aiding and abetting claim.

As an initial matter, it is plainly incorrect for plaintiff to assert that Vista "had agreed" to pay the $100 million at issue in this case. The only agreement in front of the Board was the Merger Agreement, which unambiguously provided for a per-share price of $24 for a fixed—and accurate—number of TIBCO shares that implied an aggregate equity value of $4.144 billion. The real question underlying plaintiff's first theory is whether the Board's decision not to engage with Vista in an effort to recover some or all of the additional $100 million they believed the transaction would yield was so far beyond the bounds of reasonable judgment as to be inexplicable on any ground other than bad faith. In my opinion, it was not.

The obvious risk of engaging with Vista to seek to modify the Merger Agreement was that Vista might have used such an overture as an opportunity to repudiate the $24 per share transaction reflected in the Merger Agreement—one that Goldman had opined was fair (before and after the share count error was discovered), that the plaintiff himself

---

[88] Pl.'s Ans. Br. 67, 69; *see also* Compl. ¶ 159.

views as a "good outcome,"[89] and that over 96% of TIBCO's stockholders voted to approve.[90] Put differently, the difficult decision the Board was confronted with was whether it was worth putting at risk a binding $24 per share transaction that would yield $4.144 billion for TIBCO stockholders (about 97.5% of a $4.244 billion equity value) to try to obtain some or all of an additional $0.57 per share (about 2.5% of such a value).

This risk calculation logically would take into account numerous factors, such as the Board's assessment of its likelihood of prevailing on a reformation claim if push came to shove, as well as dynamics in the industry or the markets at the time (such as the state of debt markets where Vista was looking to finance part of the transaction) that might influence Vista's reaction to an overture from the Board. Even if one viewed the risk of jeopardizing the transaction on the table by engaging with Vista to be minor, it was a risk that a reasonable person could not ignore, and the significance of which reasonable minds could disagree on in good faith. Given these practical realities, and the absence of any credible argument why the concededly disinterested and independent members of TIBCO's Board would be motivated to disregard their fiduciary duties, the facts pled in the Complaint do not come close in my view to demonstrating that the

---

[89] Pl.'s Ans. Br. 28 n. 7.

[90] TIBCO Software Inc., Current Report (Form 8-K/A) (Dec. 5, 2014). The Court may take judicial notice of the results of the vote reported in TIBCO's SEC filings because they are not reasonably subject to dispute. *See, e.g.*, *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) ("it was proper for the Court of Chancery to take judicial notice of the publicly available fact, reported by GM in a Form 10–Q filed with the SEC, that a majority of both classes of GM stockholders voted to approve the Hughes transactions.").

51

members of the Board intentionally disregarded their duties by failing to renegotiate with Vista.

Plaintiff's second line of attack—that the Board failed to adequately inform itself in the wake of the discovery of the share count error—presents more difficult questions. Plaintiff alleges, for example, that the Board never considered or explored a reformation claim and failed to ask Goldman such basic questions as (i) how the share count error occurred, (ii) whether it was Goldman's fault or not, (iii) whether Goldman had discussed the error or its implications with Vista, or (iv) whether Goldman believed Vista should or would pay the full $4.244 billion the Board believed it had secured for TIBCO's stockholders.[91] These allegations are troubling. Given, however, that the Board met twice after the share count error was discovered to assess and respond to the situation, on October 11 and 23, including at least once with Goldman, it is not reasonably conceivable in my judgment that the disinterested and independent members of the Board could be found to have entirely disregarded their fiduciary duties thereby acting in bad faith or, in the words of *Lyondell*, that they "utterly failed to attempt to obtain the best sale price." That said, these allegations are sufficient, in my view, to state a claim for a breach of the Director Defendants' duty of care.

In the celebrated *Disney* case, this Court explained that the "fiduciary duty of care requires that directors of a Delaware corporation 'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,' and 'consider all

---

[91] Compl. ¶¶ 117-18.

material information reasonably available' in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent."[92]  This Court has defined gross negligence in the context of a duty of care claim involving corporate fiduciaries to mean "reckless indifference to or a deliberate disregard of the stockholders"[93] or actions that are "without the bounds of reason."[94]  In the context of a motion to dismiss, then-Vice Chancellor Strine explained that gross negligence "requires the articulation of facts that suggest a *wide* disparity between the process the directors used . . . and [the process] which would have been rational."[95]

Here, accepting the Complaint's well-pled allegations as true for purposes of this motion, as I must, they portray a sufficiently wide gulf between what was done and what one rationally would expect a board to do after discovering a fundamental flaw in a sale process such that it is reasonably conceivable plaintiff could meet the gross negligence standard.  One rationally would expect, for example, the Board to press Goldman, which was responsible for negotiating with potential bidders and interacted directly with Vista, for a complete explanation concerning the circumstances of the share count error (*e.g.*,

---

[92] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (internal citations omitted).

[93] *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 970 (Del. Ch. 1986) (quoting *Allaun v. Consol. Oil Co.*, 147 A. 257, 261 (Del. Ch. 1929) (internal quotations omitted)).

[94] *Rabkin*, 547 A.2d at 970 (quoting *Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 615 (Del. Ch. 1974), *aff'd, Gimbel v. Signal Companies, Inc.*, 316 A.2d 619 (Del. 1974)).

[95] *Guttman v. Huang*, 823 A.2d 492, 508 n. 39 (Del. Ch. 2003).

what caused it, who was responsible, etc.) and for whatever information it could provide concerning Vista's understanding of the share count error. This information logically would have aided the Board in assessing, with the assistance of its counsel, the Company's options vis-à-vis Vista and/or Goldman to secure as much as possible of the additional $100 million of equity value it thought the transaction would realize.

Armed with a more complete picture of the situation, the Board would have been better equipped to consider, among other things, the risks of reengaging with Vista, of pressing a claim against Vista or Goldman, or whether to change its recommendation to stockholders before the Merger vote. What the disinterested members of the Board ultimately would do with this information presumably would be a matter of business judgment, and the failure to seek this information is not indicative of bad faith in my view for the reasons discussed earlier,[96] but the failure to make such basic inquiries does raise litigable questions over whether the Board acted in a grossly negligent manner and thus failed to satisfy its duty of care during the period between the discovery of the share count error and closing of the Merger.[97]

---

[96] *See In re Walt Disney Co. Deriv. Litig*, 906 A.2d 27, 66 (Del. 2006) ("[t]here is no basis in policy, precedent or common sense that would justify dismantling the distinction between gross negligence and bad faith."); *see also id.* at 64-65 ("to afford guidance we address the issue of whether gross negligence (including a failure to inform one's self of available material facts), without more, can also constitute bad faith. The answer is clearly no.")

[97] *See, e.g.*, *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 938 (Del. 2003) ("The Directors of a Delaware corporation have a continuing obligation to discharge their fiduciary responsibilities, as future circumstances develop, after a merger agreement is announced.")

In sum, because the members of the Board were concededly disinterested and independent and the Complaint fails to plead a reasonably conceivable basis for establishing that they acted in bad faith, and because the Board is exculpated from liability for a breach of the duty of care under TIBCO's charter, Count II fails to state a claim for relief. Given, however, that the allegations of the Complaint would sustain a duty of care claim against the Director Defendants, I next address plaintiff's aiding and abetting claim against Goldman.

## D. Count IV: Aiding and Abetting against Goldman

Count IV of the Complaint asserts that Goldman, as the Company's financial advisor, aided and abetted the Director Defendants in breaching their fiduciary duties. "To succeed on a claim for aiding and abetting a breach of fiduciary duty, Plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) knowing participation in that breach by the non-fiduciary."[98] For the reasons explained previously, plaintiff has adequately alleged a breach of the fiduciary duty of care that the Director Defendants owed to TIBCO, which this Court has held can form the predicate for an aiding and abetting claim.[99] Thus, factors (1) and (2) are satisfied and the analysis of whether Count IV states a claim against Goldman turns on whether the

---

[98] *Zimmerman v. Crothall*, 62 A.2d 676, 711 (Del. Ch. 2013).

[99] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54 (Del. Ch. 2014) *appeal docketed*, No. 140, 2015 (Del. argued Sep. 30, 2015) (finding financial advisor liable for aiding and abetting directors' breach of the duty of care); *see also Houseman v. Sagerman*, 2014 WL 1600724, at *8 (Del. Ch. Apr. 16, 2014); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 n.22 (Del. Ch. Jan. 25, 1999).

55

Complaint sufficiently alleges that Goldman knowingly participated in the Director Defendants' alleged breach.

"To demonstrate the 'knowing participation' element of an aiding and abetting claim, it must be reasonably conceivable from the well-pled allegations that 'the third party act[ed] with the knowledge that the conduct advocated or assisted constitute[d] . . . a breach [of fiduciary duty].'"[100] The requirement of participation can be established if the alleged aider and abettor "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue."[101]

Plaintiff asserts that Goldman, with full knowledge of the Director Defendants' duties to obtain the highest value reasonably attainable for TIBCO's stockholders, knew from its participation in the October 11 board meeting that the Board had failed to inform itself about the share count error because the Board "did not ask Goldman any relevant questions about how the error occurred or what might be done about it."[102] Most significantly, plaintiff specifically alleges that Goldman learned on October 15, through email correspondence with Vista, that Vista had relied on the erroneous share count in the Final Cap Table in making its Final Bid, but never informed the Board about this critical fact.[103] According to the Complaint, the failure to provide this information to the Board

---

[100] *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014) (quoting *Malpiede*, 780 A.2d at 1097).

[101] *Malpiede*, 780 A.2d at 1098 (Del. 2001).

[102] Pl.'s Ans. Br. 72; *see* Compl. ¶¶ 108, 118

[103] Compl. ¶¶ 113-14, 119.

is confirmed by minutes of the October 23 Board meeting, which state "it was *still unknown* if either Vista or Sponsor B used an incorrect share count in arriving at their per share bids."[104]  In my view, these allegations are sufficient to satisfy the knowing participation element of an aiding and abetting claim.

In *Rural Metro*, the Court, based on a careful analysis of the aiding and abetting jurisprudence of this Court dating back over forty years and principles of tort law, held that if a "third party knows that the board is breaching its duty of care and participates in the breach by misleading the board or creating the informational vacuum, then the third party can be liable for aiding and abetting."[105]  Here, plaintiff has pled facts from which, in my view, it is reasonably conceivable that it could sustain such a claim.

Specifically, through its involvement in the October 11 meeting, during which the Board allegedly failed to press Goldman for basic information concerning the circumstances of the share count error, it is reasonably inferable that Goldman, a highly sophisticated investment bank, knew the Board was not fulfilling its duty of care to gather all material information reasonably available about the share count error.  Most significantly, having that knowledge and having served as the primary negotiator with Vista during the bidding process, Goldman then allegedly concealed from the Board a critical piece of information:  that Vista had confirmed that it relied on the erroneous

---

[104] *Id.* ¶ 119.

[105] *Rural Metro*, 88 A.3d at 97.

share information in the Final Cap Table when it made its Final Bid.[106]  In my opinion, it is reasonably conceivable that the alleged failure to disclose this material information to the Board created an informational vacuum at a critical juncture when the Board was still assessing its options vis-à-vis Vista or Goldman to secure some or part of the $100 million equity value shortfall.  The testimony of TIBCO director West, for example, suggests that the Board may have pursued a different course in its assessment of the Company's options in October 2014 if it had been made aware of this fact.[107]

According to plaintiff, an obvious motive for Goldman to conceal this information was its desire to protect its $47.4 million fee, almost 99% of which was contingent on the transaction closing.  The Complaint further alleges that Goldman was not entitled under its Engagement Letter to $6 million of this fee amount attributable to TIBCO's convertible notes,[108] and that Goldman thus was motivated to curry favor with Vista— with which Goldman had a close relationship[109]—by not throwing sand in the gears of

---

[106] Goldman heavily disputes this assertion, and claims it conveyed this information to the Board's counsel.  *See TIBCO*, 2014 WL 6674444, at *11 n.116.  On the present motion, however, I am constrained by the well-pled allegations of the Complaint.  Thus, resolution of this issue must await a more developed factual record.

[107] *See* Compl. ¶ 120.

[108] The Complaint alleges that Goldman was not entitled under the terms of its Engagement Letter to receive 1% of the $600 million face value of the convertible notes because no consideration was paid to the noteholders in the transaction or, alternatively, because no noteholder received compensation exceeding the exercise price of the notes. Compl. ¶¶ 127-35.

[109] The Complaint alleges that the co-founders of Vista are both former Goldman bankers, that seven of Vista's thirteen principals are former Goldman bankers, that Goldman advised Vista on a $2 billion acquisition in 2012, and that Preliminary Proxy

the transaction so that Vista (as the acquirer of TIBCO) would not object to TIBCO paying the allegedly inflated $47.4 million fee.

Goldman protests that the contingent nature of its fee cannot demonstrate a motive to aid and abet a breach of fiduciary duty because banker contingent fees are routine. It is assuredly common to pay bankers contingent fees, but that does not mean that the contingent nature of such a fee here (particularly when the level of contingency is 99%) did not provide Goldman a powerful incentive in the circumstances of this case to refrain from providing information to the Board that (i) potentially would jeopardize what Goldman likely perceived to be a "done deal" after the October 11 Board meeting at which it reaffirmed the Fairness Opinion, or (ii) may have caused the Board to seek a fee reduction (or forfeiture) from Goldman depending on its role in the share count error. These allegations, combined with alleged facts concerning the $6 million component of the fee attributable to the convertible notes and the benefit to Goldman of not acting at cross-purposes with Vista to secure that component, raise a reasonable inference at this stage of the proceedings that Goldman was motivated to create an informational vacuum.

Goldman contends that alleging it did not inform the Board that Vista relied on the Final Cap Table in making its Final Bid does not mean the Board did not infer this information from other sources, such as a spreadsheet attached to the Equity

---

disclosed that "Affiliates of Goldman Sachs also may have co-invested with [Vista affiliates] . . . from time to time and may have invested in limited partnership units of [Vista] affiliates . . . from time to time and may do so in the future." Compl. ¶¶ 125-26.

59

Commitment Letter or the joint press release announcing the transaction.[110] At the motion to dismiss stage, however, it is reasonable to infer that the Board did not make such an inference, especially given the fact that the minutes of the October 23 Board meeting show that it was still uncertain about what numbers Vista had relied on. Even if the Board might have been able to draw such an inference from these or other sources, moreover, Vista's admission that it had relied on the incorrect share numbers in the Final Cap Table—information that allegedly was conveyed exclusively to Goldman—was information of a qualitatively different character because it would remove any doubt on the question and foreclose Vista from denying the fact if the Board chose to reengage with Vista.

* * * * *

In sum, for the reasons explained above, I conclude it is reasonably conceivable from the facts alleged in the Complaint that Goldman was motivated to and intentionally created an informational vacuum by failing to disclose material information to the Board at a critical time when it was evaluating and reconsidering its options concerning whether it could act to secure some or all of the $100 million in additional equity value that the

---

[110] The spreadsheet showed that Vista calculated a $4.244 billion equity value for the transaction by multiplying $24 per share by 176,817,153 fully diluted shares outstanding. Compl. ¶ 84; Pl.'s Mot. for Prelim. Inj. Ex. 21 at GS00011572 (Nov. 17, 2014). The joint press release stated that the enterprise value of the transaction was approximately $4.3 billion, which corresponds to a $4.244 equity value. Compl. ¶ 100; Pl.'s Mot. for Prelim. Inj. Ex. 1 (Nov. 17, 2014).

Board mistakenly believed it had obtained when approving the Merger.[111]  As such, the Complaint sufficiently alleges a claim for aiding and abetting the Director Defendants' duty of care.  Accordingly, the motion to dismiss Count IV for failure to state a claim for relief is denied.

### E.    Count V: Professional Malpractice against Goldman

Count V of the Complaint asserts that Goldman is liable to a putative class of TIBCO's stockholders for professional malpractice and negligence for failing to timely discover and correct the share count error as part of its financial advisory services.  Plaintiff argues that this claim arises under the law of California, where TIBCO is headquartered and where the allegedly negligent services were rendered.  In particular, relying on the California Supreme Court's 1958 decision in *Biakanja v. Irving*, plaintiff argues that "the determination of whether a professional owes a duty to third parties not

---

[111] Goldman places substantial reliance on *Houseman v. Sagerman* for its finding that just because "KeyBanc [the financial advisor] did not *directly* furnish information to Mr. Houseman does not support an inference that KeyBanc knew Mr. Houseman or any other director was acting uninformedly in evaluating the transaction."  2014 WL 1600724, at *9.  *Houseman* is distinguishable for two reasons.  First, the alleged failure to provide information in *Houseman* was only to a single director, not to the entire board or to the company itself.  *See id.* ("[L]ack of disclosure of certain facts to *Mr. Houseman* and to the Universata stockholders is unavailing, because the Plaintiffs fail to adequately plead that KeyBanc created an 'informational vacuum' assisting the Universata *Board* in breaching its duty of care.").  Second, KeyBanc's engagement in *Houseman* was far more limited than Goldman's in the present case, diminishing the likelihood that it would be as involved in the bidding process and thus serve as such a critical source of information to a board.  *See id.* at *2 (engagement limited to "assisting in due diligence and identifying additional parties that could have an interest in acquiring the Company"), *id.* at *3 ("KeyBanc did not prepare a written presentation summarizing its work, nor did it present a formal fairness opinion") (internal quotation marks and alterations omitted).

61

in privity with the professional 'is a matter of policy and involves the balance of various factors,'" which he contends weigh in his favor here.[112]

In *Biakanja*, a notary preparing a will for his client failed to have it properly attested. As a result, the decedent's sister inherited only an eighth of the estate instead of the entire estate to which she would have been entitled had the will been valid. The California Supreme Court held that the notary was liable to the decedent's sister, despite a lack of privity of contract with her. The Court stated that "[t]he determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors," which include:

> [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.[113]

Applying these factors, the *Biakanja* Court held that, having drafted the will, the defendant should have foreseen that its faulty execution would harm the decedent's sister, and that her inability to inherit the full estate was the direct result of the defendant's negligent drafting and unauthorized practice of law.[114] Here, relying on the broadly stated factors enumerated in *Biakanja*, plaintiff argues in a single paragraph that Goldman should be held to account directly to TIBCO's stockholders because "it was foreseeable that any miscalculation of the number of shares outstanding when

---

[112] Pl.'s Ans. Br. 78 (quoting *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (Cal. 1958)).

[113] *Biakanja*, 49 Cal. 2d at 650.

[114] *Id.* at 651.

establishing the Merger price would directly reduce the price each stockholder would receive."[115]

Goldman, which does not object to the application of California law for purposes of this motion,[116] argues that plaintiff lacks standing to assert a professional malpractice claim against it because such a claim belongs exclusively to its client which, as stated in its Engagement Letter, was the Special Committee. Goldman further emphasizes that the Engagement Letter expressly disclaims that Goldman owed any duties to TIBCO's stockholders:

> You recognize that Goldman Sachs has been retained to act as financial advisor to the Special Committee, and our engagement hereunder is not on behalf of, nor intended to create any relationship with, or duty to, any other person, including affiliates or stockholders of the Company.[117]

As to plaintiff's reliance on *Biakanja*, Goldman asserts that later decisions have limited its application to professionals (like contractors and architects) whose services have caused physical harm.[118] I consider this issue next.

In 1992, in a thorough reconsideration of the policies animating its earlier decision in *Biakanja,* the California Supreme Court held in *Bily v. Arthur Young & Co.*[119] that an auditor did not owe a general duty of care to investors of a corporation for which it

---

[115] Pl.'s Ans. Br. 79.

[116] *See* Goldman's Op. Br. 15 n. 6; Goldman's Reply Br. 10 n. 9.

[117] Miller Aff. Ex. 1 (Engagement Letter) at GS00000006 (Apr. 2, 2015).

[118] Tr. of Oral Arg. 177-79 (July 23, 2015).

[119] *Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal. 1992).

performed auditing services. The court specifically declined to extend *Biakanja*'s foreseeability-based test to "permit all merely foreseeable third party users of audit reports to sue the auditor on a theory of professional negligence," limiting the auditor's liability under a theory of general negligence to its client.[120] The court referenced one of its earlier decisions that drew a distinction between physical and nonphysical harm to eloquently explain the limitations of a foreseeability-based test:

> [F]oreseeability . . . is endless because [it], like light, travels indefinitely in a vacuum. [It] proves too much . . . Although it may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm . . . It is apparent that reliance on foreseeability of injury alone in finding a duty, and thus a right to recover, is not adequate when the damages sought are for an intangible injury . . . .[121]

The *Bily* Court cited three central public policy concerns motivating its holding: (1) exposing auditors to negligence claims "from all foreseeable third parties" would cause "potential liability out of proportion to fault;" (2) the sophisticated investors, creditors and others who read and rely on auditors reports could "rely on their own prudence, diligence and contracting power, as well as other informational tools," to protect themselves; and (3) the "dubious benefits of a broad rule of liability" as compared to a likely increase in cost and decrease in availability services.[122] Significantly, *Bily*

---

[120] *Id.* at 761.

[121] *Id.* at 762 (quoting *Thing v. La Chusa*, 771 P.2d 814, 823 (Cal. 1989)) (internal quotation marks and alterations omitted).

[122] *Bily*, 834 P.2d at 761, 765, 767.

suggested its holding would apply to other professional "suppliers of information and evaluations:"

> Accountants are not unique in their position as suppliers of information and evaluations for the use and benefit of others. Other professionals, including attorneys, architects, engineers, title insurers and abstractors, and others also perform that function. And, like auditors, these professionals may also face suits by third persons claiming reliance on information and opinions generated in a professional capacity.[123]

Following *Bily*, California courts have seized on that language to decline to allow third parties to sue other professional service firms. In 1997, a California intermediate court quoted that portion of *Bily* to hold that a law firm was not liable for negligence to a non-client, stating simply: "We assume, therefore, that the [*Bily*] court intended its discussion of liability of third parties to be considered in a case such as the one now before us."[124] In 1998, the California Supreme Court applied *Bily* to find no negligence liability to third parties for a title insurer. It put the principle more broadly, holding that "[w]ith rare exceptions, a business entity has no duty to prevent financial loss to others with whom it deals directly. A fortiori, it has no greater duty to prevent financial losses to third parties who may be affected by its operations."[125]

The Ninth Circuit has interpreted California law to impose similar limitations on the application of *Biakanja* in view of *Bily* and later decisions. For example, in *Glenn K. Jackson Inc. v. Roe*, based on its examination of post-*Bily* precedents, the Ninth Circuit

---

[123] *Id.* at 770.

[124] *B.L.M. v. Sabo & Deitsch*, 55 Cal. App. 4th 823, 830 n.3 (Cal. App. 1997).

[125] *Quelimane Co., Inc. v. Stewart Title Guaranty Co.*, 960 P.2d 513, 533 (Cal. 1998).

affirmed a trial court's finding that an accountant owed no duty to a third party it had audited for its client, stating that "the limitations *Bily* placed on the *Biakanja* factors apply widely to those who supply or evaluate information to limit their liability to even foreseeable third parties who have an interest in their work product."[126] Eight years later, the Ninth Circuit similarly declined to find that a firm providing actuarial services owed a duty of ordinary care to non-clients, stating that "California law sharply limits the duty of ordinary care imposed on a supplier of information to non-clients."[127]

Plaintiff has not cited any case in which a court has extended the reasoning of *Biakanja* to permit a third party to sue a financial advisor for malpractice. The only post-*Bily* decisions plaintiff has identified in which courts have sustained claims under *Biakanja* (against a general contractor and an architect) both involved physical damage to property.[128] Relying on an unpublished decision of a California intermediate court,

---

[126] 273 F.3d 1192, 1199 (9th Cir. 2001).

[127]*Paulsen v. CNF Inc.*, 559 F.3d 1061, 1077 (9th Cir. 2009). The Ninth Circuit considered the California Supreme Court's decision in *Quelimane*, discussed above, as well as decisions in *Cabanos v. Gloodt Assocs.*, 942 F.Supp. 1295, 1308-10 (E.D. Cal. 1996) (appraiser owed no duty of ordinary care to third party); *Sanchez v. Lindsey Morden Claims Services, Inc.*, 72 Cal. App. 4th 249 (1999) (insurer-retained claims adjuster owed no duty to insured); and *Soderberg v. McKinney*, 44 Cal. App. 4th 1760, 1768 (1996) ("While *Bily* involved the liability of accountants (or auditors), we see no reason why its discussion should be limited to that group of professionals.").

[128] *See Burch v. Superior Court*, 223 Cal. App. 4th 1411 (Cal. 2014) (permitting homebuyer to sue general contractor for property damage caused by a construction defect); *Beacon Residential Cmty. Ass'n. v. Skidmore, Owings & Merrill LLP*, 327 P.3d 850 (Cal. 2014) (permitting homeowners association to sue primary architect for design defects causing property damage). *But see Weseloh Family Ltd. P'ship v. K.L. Wessel Constr. Co., Inc.*, 125 Cal. App. 4th 152, 164-73 (Cal. 2004) (applying *Bily* to find that

Goldman argues that the only California decision either party has cited regarding professional negligence claims against a financial advisor in the merger context (coincidentally, against Goldman) made clear that such a claim only could be asserted by the client.[129] That decision, however, did not discuss *Biakanja* and its progeny or analyze the question in any meaningful sense.[130]

Having carefully reviewed the cited case law, it is my opinion that California law would not afford TIBCO's stockholders standing to sue Goldman on a negligence theory for an economic loss based on the policies articulated in *Biakanja* over half a century ago. The post-*Bily* decisions rendered over the past twenty-three years suggest instead that liability for professional service firms to third parties under California law tends to be limited to instances of physical harm or property damage, rather than economic loss. This is a classic distinction in tort law, where in "situations in which the plaintiff has neither suffered personal injury nor damage to tangible property . . . American law is generally opposed to recovery on a negligence theory."[131] This distinction also was the

_____

engineering firm that designed retaining wall owed no duty to property owner for property damage).

[129] *See Carrigan v. Goldman*, 2011 WL 4600382, at *3 (Cal. Ct. App. Oct. 6, 2011) ("complaints regarding . . . [the] performance by Goldman Sachs in its role as financial advisor . . . for professional malpractice or otherwise" are "not direct claims [that may be pursued by stockholders] but derivative ones belonging to [Goldman's client].").

[130] The focus of the *Carrigan* decision was whether plaintiff had stated a claim against Goldman for aiding and abetting a breach of fiduciary duty, which the court considered as a matter of Delaware law.

[131] Herbert Bernstein, *Civil Liability for Pure Economic Loss Under American Tort Law*, 46 Am. J. Comp. L. 111, 112 (1998).

starting point for the *Bily* Court, as it examined Chief Justice Cardozo's analysis in the seminal *Ultramares* case, which "distinguished between liability arising from a 'physical force' and 'the circulation of a thought or the release of the explosive power resident in words.'"[132] *Bily* and the subsequent cases have largely preserved that distinction, whereby professional service firms have been found liable in the construction context— when their negligence causes direct harm to person or property—but not when they provide "a broadly phrased professional opinion based on a necessarily confined examination of client-provided information" or act as "suppliers of information and evaluations for the use and benefit of others."[133] For these reasons, Count V fails to state a claim for relief under California common law in my opinion.

### F.      Count VI:  Unjust Enrichment against Vista

Count VI of the Complaint asserts that, because Vista paid $100 million less to acquire the stock of TIBCO than it expected to pay, it was unjustly enriched by that amount.  Vista contends that this claim should be dismissed for several reasons, including because a contract—the Merger Agreement—comprehensively governs the parties' relationship in this case.  I agree.

The primary case on which plaintiff relies, *Great Hill Equity Partners IV, LP v. SIG Growth Equity*, provides a helpful summary of Delaware law on unjust enrichment:

---

[132] *Bily*, 834 P.2d at 753 (quoting *Ultramares Corp. v. Touche*, 174 N.E. 441, 445 (N.Y. 1931)).

[133] *Beacon*, 327 P.3d at 860 (quoting *Bily*, 834 P.2d at 765, 770) (internal quotations omitted).

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of equity and good conscience." It was developed "as a theory of recovery to remedy the absence of a formal contract." To plead a claim for unjust enrichment, a plaintiff must plead "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and the absence of a remedy provided by law."

\* \* \* \* \*

In evaluating unjust enrichment claims, Courts conduct a threshold inquiry "as to whether a contract already governs the parties' relationship." "If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied." If the validity of that agreement is challenged, however, clams of unjust enrichment may survive a motion to dismiss. Further, this Court has recognized that, "[i]in some situations, . . . both a breach of contract and an unjust enrichment claim *may* survive a motion to dismiss when pled as alternative theories of recovery." This may be the case where a plaintiff pleads a right to recovery "not controlled by contract" or where "it is the [contract], itself, that is the unjust enrichment.[134]

Here, a comprehensive agreement indisputably governs the parties' relationship in the form of the 87-page Merger Agreement, Section 2.7(a)(ii) of which sets forth the per-share price to be paid for each outstanding share of TIBCO common stock as of the effective date of the Merger. There is, perhaps, no better evidence of this than the fact that the plaintiff's lead claim in this case is to reform the Merger Agreement to increase the aggregate purchase price for TIBCO equity by $100 million, or $0.57 per share price.

Plaintiff seeks to avoid the obvious conclusion that a formal contract defines the parties' relationship by seizing on the parts of the quote from *Great Hill* set forth above stating that an unjust enrichment claim may survive a motion to dismiss even if a

---

[134] 2014 WL 6703980, at *27 (Del. Ch. Nov. 26, 2014) (internal citations omitted).

comprehensive contract is in place "[i]f the validity of that agreement is challenged" or "it is the [contract], itself, that is the unjust enrichment."[135] Assuming, *arguendo*, that plaintiff's claim for reformation constitutes a challenge to the "validity" of the Merger Agreement, the reformation claim fails to state a claim for relief for the reasons explained above and, thus, no legally viable challenge to the Merger Agreement remains.

Having been unable to state a legally cognizable claim to reform or otherwise challenge the price term of the Merger Agreement, plaintiff also has failed to plead an absence of justification for Vista to expect the terms of the Merger Agreement to be honored. This would be true even if Vista did have a mistaken belief about how much it would pay for all of the equity of TIBCO when it signed the Merger Agreement. This result may seem harsh when considering notions of fairness from a 64,000 foot level, but either there is a legal basis to reform the Merger Agreement or there is not. Having found that plaintiff has failed to plead such a basis in this case, the conclusion logically follows that the comprehensive contract that governs the parties' relationship here must alone determine the measure of plaintiff's rights in this case. For these reasons, Count VI fails to state a claim for relief.

---

[135] This latter phrase comes from *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008). There, a stockholder asserted claims for breach of fiduciary duty and unjust enrichment challenging the corporation's (i2) sale of a subsidiary to a former officer (Dubreville). The case is inapposite because the Court expressly did not decide whether a binding contract governed the subject matter of the unjust enrichment claim. *Id.* ("even if there is a contract between Dubreville and i2, which I do not decide . . .").

### G. Count VII: Unjust Enrichment against Goldman

Count VII of the Complaint asserts that Goldman was unjustly enriched by at least $6 million on the theory that convertible notes of TIBCO having a face value of $600 million should not have been included as part of the "aggregate consideration" on which Goldman was entitled to a 1% transaction fee under its Engagement Letter. Application of the same principles of unjust enrichment stated above dictate that this claim be dismissed because it is undisputed that a contract signed by Goldman, TIBCO and the Special Committee—the Engagement Letter—governs this dispute. Indeed, the Complaint specifically alleges that Goldman's enrichment stems from the fact that its fee was "calculated . . . inconsistent with the terms of the Engagement Letter."[136] Thus, whatever the merits may be of plaintiff's contention that the convertible notes should not have been included in the calculation of Goldman's transaction fee, that claim is entirely controlled by the meaning of the contractual terms set forth in the Engagement Letter. For this reason, Count VII fails to state a claim for relief.

## IV. CONCLUSION

For the foregoing reasons, defendants' various motions to dismiss Counts I, II, V, VI and VII of the Complaint for failure to state a claim for relief are granted, and Goldman's motion to dismiss Count IV is denied.

**IT IS SO ORDERED.**

---

[136] Compl. ¶ 186.